[Crim. No. 16299. In Bank. Jan. 15, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
TIMOTHY ALAN McREYNOLDS, Defendant and Appellant.

**COUNSEL**

Richard S. Buckley, Public Defender, James L. McCormick and H. Reed Webb, Deputy Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and William R. Pounders, Deputy Attorney General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—Defendant appeals from a conviction of possession of a restricted dangerous drug. (Health & Saf. Code, § 11910.)

Approximately 3 a.m. on September 14, 1970, two police officers in a patrol car observed the automobile of defendant, a college student returning from a vacation trip to the Colorado River, proceed through

an intersection against a red signal. They undertook pursuit, but did not activate their siren or warning light or otherwise identify themselves. When they were approximately 150 yards behind defendant's vehicle they observed it pull over to the curb and stop. As they approached, they saw defendant lying across the front seat with his head toward the passenger's side. Defendant then sat up.

At the officers' request defendant alighted from the vehicle and produced his driver's license for examination by one officer. Meanwhile the other officer physically entered the vehicle from the driver's side, leaned across the front seat to unlock the passenger's door from the inside, then exited and walked around the car, opened the door on the passenger's side, and searched the front floorboard with a flashlight. The officer testified that during that search he discovered a small white tablet he believed to be benzedrine. Defendant was placed under arrest for possession of a dangerous drug and his pockets were searched, revealing a cellophane package of six or seven similar tablets. Chemical analysis showed the tablets contained amphetamine.

■ In *People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807 [91 Cal. Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559], and *Gallik* v. *Superior Court* (1971) 5 Cal.3d 855 [97 Cal.Rptr. 693, 489 P.2d 573], we recently reaffirmed the principle that conduct of an automobile occupant reasonably susceptible of innocent interpretation does not constitute probable cause to search the vehicle incident to citation for a traffic violation. As we explained in *Kiefer* (at p. 829), to allow a random search in ordinary traffic violation cases would constitute an intolerable and unreasonable intrusion into the privacy of the vast majority of peaceable citizens who travel by automobile. A search is therefore constitutionally authorized only if the conduct would induce a reasonable man to believe that contraband or weapons are being concealed. (Accord, *United States* v. *Robinson* (D.C.Cir. 1972) 471 F.2d 1082.)

■ The Attorney General suggests three facts in the record that assertedly render the total atmosphere of this case distinguishable from *Kiefer* and *Gallik*. First, defendant pulled his vehicle to the curb on his own accord instead of being stopped by the officers. But halting a vehicle voluntarily is not suspicious conduct. On the contrary, under these circumstances the act tends to remove suspicion from the defendant, since it suggests his behavior was motivated by something other than a consciousness of police pursuit. At the time he stopped his vehicle, defendant apparently was unaware of the proximity of law enforcement officers; to him the patrol car appeared to be nothing more than a pair of headlights in his rearview mirror. We anticipated this identical situation in *Kiefer*,

when we pointed out if the defendant had not seen the police or did not recognize the vehicle following him to be a police car, "any movement he made would be irrelevant." (3 Cal.3d at p. 821.)

Next the People stress that defendant was observed to be lying down, while the automobile occupants in *Kiefer* and *Gallik* were merely bending over. The distinction seems insignificant. Although a prone position in an automobile is perhaps less common than bending over, it is not less susceptible of innocent interpretation. Since the facts suggest defendant was unaware of the impending confrontation with the police, no reason exists to believe he was attempting concealment of any object.[1] He might, as he testified, have been adjusting a loose connection in the fuse box under the dashboard. Even if, despite the absence of siren or red light in the darkness of night, the officers could reasonably have believed defendant was somehow aware of their silent pursuit, they would have had little cause to suspect his purpose was anything but innocent, such as reaching for his driver's license or registration in the glove compartment on the far side of the car. Thus defendant's simple act of reclining across the front seat did not furnish probable cause for the search. (See generally *Kiefer*, at pp. 821-823 of 3 Cal.3d.)

The third asserted distinction is that the confrontation in this case took place at night, while those in *Kiefer* and *Gallik* occurred during the day. But we have already explained the minimal importance of the nighttime factor: as we stated in *Kiefer* (at p. 825), "the fact that it is night when the police appear is not 'conduct' of the motorist 'in response to' the officer's signal. The significance of this fact should therefore be appraised with caution; it does not, without more, transform an innocent gesture into a culpable one furnishing probable cause to search."

This case is squarely controlled by *Kiefer* and *Gallik*. For the reasons there stated, the court committed prejudicial error in admitting the evidence found in the search of defendant's car.

The judgment is reversed.

Wright, C. J., Tobriner, J., and Sullivan, J., concurred.

---

[1]The rationalization that the officers could search the vehicle for hidden weapons in the interest of their own safety does not withstand analysis. Neither officer in his testimony articulated any fears for his safety from this college student-traffic violator, and their conduct indicated no such apprehension. One officer directed the defendant to "step to the rear of the car," where he examined the driver's license and kept the defendant under surveillance. With the defendant thus physically unable to reach a weapon in the car had there been any—there were none; only water skis on the seat—the second officer entered the vehicle and conducted the search which produced one white tablet.

**BURKE, J.**—I dissent. Under the circumstances in this case, the arresting officers were entirely justified in making the limited protective search for weapons undertaken here. Any other course of conduct would have amounted to reckless disregard for their own safety.

The incident occurred at 3 o'clock in the morning in an area totally devoid of other traffic. Defendant stopped at the intersection where the officers' patrol car was parked and then drove through a red traffic light at the intersection. The officers pursued defendant for about a quarter of a mile. When the officers approached to within 150 yards of defendant's car, defendant pulled over to the side of the road and lay down on the front seat with his head toward the passenger side. He remained in this position until the officers approached his car. As there was no other traffic in the area, the officers could reasonably assume that defendant was aware of their presence when he first stopped his car.

The officers told defendant to leave the car, and while one officer was checking defendant's identification, the other conducted the flashlight "search" in question. The "search" consisted of the officer shining his flashlight on the floorboard in the area where defendant had disappeared from view. This is not a case of rummaging through defendant's car, opening the glove compartment or trunk, or even searching beneath the seats. The officer testified, "I was looking on the floorboard—didn't know why he was laying down. Possibility of concealing a weapon or something or other, and this is why I looked at the floorboard."

The majority rely upon *People* v. *Superior Court (Kiefer)* 3 Cal.3d 807, 830 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559], and *Gallik* v. *Superior Court,* 5 Cal.3d 855 [97 Cal.Rptr. 683, 489 P.2d 573], but those cases are distinguishable on their facts. In each case, the arrest took place in "broad daylight," a factor which was emphasized in those cases. Moreover, in each case, the officer's avowed purpose for the search was simply exploratory—to see what might turn up; the court noted that his concern for possible weapons was an afterthought. In *Kiefer,* we set forth numerous additional facts which disclosed that the officer's conduct was unreasonable under the circumstances. The court stated, however, that when a suspect makes a furtive movement which could indicate concealment of a weapon, "On its face, this concern [for the officer's own safety] is quite comprehensible." (3 Cal.3d at p. 830.)

As I pointed out in a recent decision, an officer should not be required to wait until a gun is drawn or fired before he may take the standard minimum precautions for his own safety; in traffic arrest cases, a limited protective search should be permitted whenever the officer has a reasonable

fear for his safety. (*Kaplan* v. *Superior Court,* 6 Cal.3d 150, 162-163 [98 Cal.Rptr. 649, 491 P.2d 1] [concurring opn. by Burke, J.].) In the instant case, given the time of the occurrence, the absence of other traffic, and defendant's act of lying down in the seat, after the officers had pulled up behind him, I think the flashlight search was clearly reasonable.

In *Kiefer* itself, the court acknowledged the great risks which our police officers face and urged the courts to " 'do all in their constitutional powers to minimize these risks.' " (6 Cal.3d at p. 163.) This case presents such an opportunity and we should uphold the harmless flashlight "search" involved here. As noted in *Kiefer,* "even a minor traffic citation incident can occasionally erupt into violence." (3 Cal.3d at p. 829.) I would affirm the judgment.

McComb, J., concurred.