[Crim. No. 20369. July 17, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
JACK LEE BOWER, Defendant and Appellant.

**COUNSEL**

Paul N. Halvonik, State Public Defender, under appointment by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, Philip A. Schnayerson and Philip M. Brooks, Deputy State Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Gloria F. DeHart and Thomas A. Brady, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BIRD, C. J.**—This court must decide whether an officer may constitutionally detain a citizen because he is a white man who happens to be with a group of black men in a black residential area at 8:37 p.m.

I

At 8:37 p.m. on Monday, December 22, 1975, Officers Philip F. Povey and James Hunt of the San Francisco Police Department were in a

marked patrol car about 50 yards from the entrance to a residential complex at 1127 Pierce Street. Officer Povey observed appellant (a Caucasian), a black woman, and two or three black men come out of an elevator at "the projects."

The officer testified his attention was drawn to appellant because "he was white with a group of blacks." In order to try "to show that a white person in this area of the night [*sic*] is very suspicious in nature, that it is criminal activity," the prosecution elicited testimony from Officer Povey that in his three and one-half years as a police officer in this "predominantly black" area, he (the officer) had "never observed a white person in the projects or around the projects on foot in the hours of darkness or [*sic*] for innocent purpose." The officer elaborated that he had arrested 20 white persons[1] for narcotics offenses occurring "in the evening, night time, in the hours of darkness;" that he had contacted but had not arrested six other Caucasians who "were approaching the projects in order to purchase narcotics;" and that he had encountered an unspecified number of white persons who were "victims of armed robberies or strong armed robberies."

Officer Povey observed that appellant and the group of blacks were talking as they walked to a stairway which led to the parking lot where the patrol car was located. When they looked in the direction of the police car, they stopped, turned around, and went back to the elevator, which had closed. The individuals returned to the stairway and "formed like a huddle of some sort," and the officer noticed they were conversing. Two of the blacks walked away from the group and "returned back to the group as if one individual, black male, had called them back." The conversation continued.

Officer Povey decided "something was wrong and . . . thought either narcotics or weapons were involved, due to the hour and a white male being in the projects with these other people." He radioed for other units "to come in and try to seal the area off."

The individual who had called the two others back started moving hurriedly away from the group while looking back over his shoulder toward the police car. The officers sent a radio car to the area where he was headed. Then they got out of their own vehicle and walked toward the remaining individuals,[2] who moved apart and the group "fragment-

---

[1] Officer Povey said he had made approximately 500 total arrests during his assignment in the area, primarily for narcotics, weapons, or robbery.

[2] Officer Povey testified that approximately four minutes had passed since he first observed the group leaving the elevator.

ed." Officer Povey "picked one individual out" (appellant) and, while that person was proceeding at a "very quick walk, almost a run" through a passageway to a nearby street, the officer told him to stop and turn around. Appellant complied, and a pat search for weapons was begun. At appellant's waist, the officer felt an object he recognized as the handgrip to a weapon. The weapon, a pistol, was seized and appellant arrested. Appellant was subsequently convicted of being a felon in possession of a concealable firearm. (Pen. Code, § 12021.)

## II

The threshold issue confronting this court is whether Officer Povey "detained" appellant within the meaning of the Fourth Amendment to the United States Constitution and article I, section 13 of the California Constitution.[3]

■ Courts have broadly defined the term detention. The United States Supreme Court has held that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person" within the meaning of the Fourth Amendment. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 16 [20 L.Ed.2d 889, 903, 88 S.Ct. 1868].) In California, courts have found a "clear" detention in a situation where an officer "went to the telephone booth [the defendant was using], and asked defendant his name and several questions." (*People* v. *Moore* (1968) 69 Cal.2d 674, 678, 683 [72 Cal.Rptr. 800, 446 P.2d 800].) Most recently, this court added a separate, new test. A detention also occurs whenever an officer accosts an individual on suspicion that the person "may be personally involved in some criminal activity. . . ." (*In re Tony C.* (1978) 21 Cal.3d 888, 895 [148 Cal.Rptr. 366, 582 P.2d 957].)

It is obvious that Officer Povey detained appellant under each of these existing definitions. Since the officer stopped appellant based on a suspicion that he was personally involved in "either narcotics or weapons," there was a detention under the test of *In re Tony C.* Moreover, since the officer's call to appellant to stop and to turn around clearly "restrain[ed] his freedom to walk away," the test of *Terry* v. *Ohio* was met. It is also manifest that the conduct of Officer Povey was more of an assertion of authority than that of the officer in *People* v. *Moore.*

---

[3]Hereinafter, unless otherwise specified, the term "Fourth Amendment" as used in this opinion refers to both our state and federal guarantees against unreasonable seizures.

■ It is the general rule that "[a]lthough circumstances short of probable cause to make an arrest may still justify an officer in stopping a pedestrian on the street for questioning, a police officer may not detain and question a person when there are no circumstances which would indicate to a reasonable man in a like position that such a course was necessary to the proper discharge of the officer's duties." (*People* v. *Moore, supra,* 69 Cal.2d at pp. 682-683.) As with all warrantless intrusions, the burden lies with the state to justify a detention. To legally detain an individual because of "suspicious circumstances," the prosecution must establish on the record that at the moment of the detention, there were specific and articulable facts, which reasonably caused the officer to believe that (1) some activity out of the ordinary had taken place or was occurring or about to occur; (2) the activity was related to crime; and (3) the individual under suspicion was connected to the activity. (*Irwin* v. *Superior Court* (1969) 1 Cal.3d 423, 427 [82 Cal.Rptr. 484, 462 P.2d 12].) The prosecution must show that the officer personally entertained such suspicions and that these were objectively reasonable. (*In re Tony C., supra,* 21 Cal.3d at p. 893, fn. 2.) If the underlying facts fail to reasonably "distinguish [the suspected individual] from any other citizen . . . at that time and place," the detention is not justified. (*People* v. *Moore, supra,* 69 Cal.2d at p. 683; *People* v. *One 1960 Cadillac Coupe* (1964) 62 Cal.2d 92, 96 [41 Cal.Rptr. 290, 396 P.2d 706].)[4]

■ The central issue in the present case involves the first two prongs of this three-part test, i.e., whether the facts known to Officer Povey justified his conclusion that unusual activity was afoot and was related to crime. The officer consistently testified that his decision to detain was based upon "the hour and a white male being in the projects with these other people," explaining that appellant was a Caucasian in a predominantly black area where the officer had never observed a white person "on foot in the hours of darkness . . . for innocent purpose."

■ Initially, the fact that appellant was a white man could raise no reasonable suspicion of crime. A person's racial status is not an "unusual" circumstance and the presence of an individual of one race in an area inhabited primarily by members of another race is not a sufficient basis to suggest that crime is afoot. Freedom to travel and to associate are fundamental rights in this state, and the suggestion that their exercise can

[4]As this court recently declared, "an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith." (*In re Tony C., supra,* 21 Cal.3d at p. 893; citation omitted.)

contribute to a lawful seizure of one's person under these circumstances is both illogical and intolerable.

■ No reasonable suggestion of criminality is added by the fact it was dark when the officer observed appellant. Strictly speaking, the "night-time factor"[5] is not "activity" by a citizen, and this court has warned that this factor "should be appraised with caution" (*People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 825 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]) and that it has, at most, "minimal importance" in evaluating the propriety of an intrusion (*People* v. *McReynolds, supra,* 8 Cal.3d 655, 658). In the present case, the time at which the detention occurred (8:37 p.m.), while falling during darkness in winter, is simply not a late or unusual hour nor one from which any inference of criminality may be drawn. (Accord, *People* v. *Lathan* (1974) 38 Cal.App.3d 911, 915 [113 Cal.Rptr. 648] [ ". . . 10:15 p.m. is hardly a late or unusual hour."].) An individual in public at such times does not reasonably suggest crime is afoot.

■ Finally, the officer's assertion that the location lay in a "high crime" area does not elevate these facts into a reasonable suspicion of criminality. The "high crime area" factor is not an "activity" of an individual. Many citizens of this state are forced to live in areas that have "high crime" rates or they come to these areas to shop, work, play, transact business, or visit relatives or friends. The spectrum of legitimate human behavior occurs every day in so-called high crime areas. As a result, this court has appraised this factor with caution and has been reluctant to conclude that a location's crime rate transforms otherwise innocent-appearing circumstances into circumstances justifying the seizure of an individual. (See *In re Tony C., supra,* 21 Cal.3d at p. 897; *Cunha* v. *Superior Court* (1970) 2 Cal.3d 352, 357 [85 Cal.Rptr. 160, 466 P.2d 704]; *People* v. *Moore, supra,* 69 Cal.2d at p. 683; see also *People* v. *Lathan, supra,* 38 Cal.App.2d at p. 915; *People* v. *Conley* (1971) 21 Cal.App.3d 894, 899-900 [98 Cal.Rptr. 869].)

Moreover, this court recently observed that the "high crime area" justification is "easily subject to abuse." (*In re Tony C., supra,* 21 Cal.3d at p. 897.) For example, this court has warned of the "dangers" of using an officer's experience as to prior arrests to conclude that a location's crime rate is high. (*Cunha* v. *Superior Court, supra,* 2 Cal.3d at p. 357, fn. 1.) Where there is no indication that those arrests were themselves

[5]*People* v. *McReynolds* (1973) 8 Cal.3d 655, 658 [105 Cal.Rptr. 691, 504 P.2d 915].

proper[6] or that they resulted in convictions of the persons arrested,[7] it is impossible to use them as an accurate assessment of crime rate for the purpose of evaluating the validity of a later intrusion upon an individual's personal security. (Cf., *ibid.*)[8]

Respondent appears to concede that these meager facts are insufficient to justify the detention in this case, but urges that they are sufficient when combined with the officer's personal experience that "for whatever reason, Caucasian 'outsiders' did not visit the area during the evening for social purposes. . . ." ■ However, "[a]lthough specialized knowledge may render suspicious what would appear innocent to a layman, the test remains whether the circumstances would ' "warrant a man of reasonable caution" '—who possessed such knowledge—' "in the belief" that the action taken was appropriate. . . .' " (*Cunha* v. *Superior Court, supra,* 2 Cal.3d at p. 358, quoting from *Terry* v. *Ohio, supra,* 392 U.S. at pp. 21-22 [20 L.Ed.2d at p. 906].) The personal suspicion of an officer that a white person would not be in a black area at 8:37 p.m. except to engage in crime cannot qualify as specialized knowledge within the rule, nor convert innocent circumstances into criminal ones. Moreover, if, as this court has found, the alleged crime rate of an *area* is "easily subject to abuse," it should be obvious that one officer's perception of the criminal

---

[6]"[P]olice officers cannot utilize invalid arrests as a basis for estimating a particular location's crime rate and then utilize the resulting estimate in determining the reasonableness of an arrest and search in that location." (*Remers* v. *Superior Court* (1970) 2 Cal.3d 659, 668-669 [87 Cal.Rptr. 202, 470 P.2d 11].)

[7]"[A] prior related *arrest* where there is no conviction must have even less than a 'slight tendency' to establish a present violation of the law." (*Remers* v. *Superior Court, supra,* 2 Cal.3d at p. 668, italics in original.)

[8]This court has observed that "giving substantial weight to the perceived crime rate of an area [based on arrests alone] may constitute a self-fulfilling prophecy." (*Ibid.*)
Some other problems with the "high crime area" justification appear in the cases. Often, the courts have been told in conclusory terms that an area has a "high crime rate" without being advised of the basis for the conclusion or of the nature of the crime or crimes involved. (Cf., *People* v. *Lathan, supra,* 38 Cal.App.3d at p. 915.) Or, the "area" to which a "high crime rate" label has been attached may be a large one, without any attempt being made to show that that overall crime rate is valid in the particular location in question. (Cf., *ibid.*) On other occasions, it is abstractly asserted that an area has a high crime rate without showing how the allegedly suspicious activity involved in the particular case is related to the type of activity upon which that crime rate estimate is based. To the extent such foundational matters are lacking, courts cannot logically be expected to accord considerable weight to this factor.
. Finally, there is as yet no consistent or predictable agreement as to what "rate" of crime is a "high" one for this purpose. While it may be valid to say that one burglary a year in a neighborhood is too many, as a practical matter attaching a high crime label under such circumstances would do little to differentiate one location from another in any meaningful way.

tendencies of a *racial group* is far more so. (See *In re Tony C., supra,* 21 Cal.3d at p. 897.)

Respondent also argues that this detention was justified because of the assertedly suspicious behavior of appellant and his black companions. However, as has been noted previously, Officer Povey himself repeatedly stated that the group was suspicious because of "the hour and a white male being in the projects with these other people." ■ A detention may not be justified after the fact on a basis not relied on by the officer. This would countenance a detain-now-justify-later approach to police instructions which is contrary to the constitutional requirements that protect a citizen against unreasonable searches and seizures.

Even were reliance on this activity proper, it would not justify the detention in the present case. This court has discussed the problems inherent in attempting to infer criminal activity from allegedly "furtive" behavior. "The difficulty is that from the viewpoint of the *observer,* an innocent gesture can often be mistaken for a guilty movement. He must not only perceive the gesture accurately, he must also interpret it in accordance with the actor's true intent. But if words are not infrequently ambiguous, gestures are even more so. Many are wholly nonspecific, and can be assigned a meaning only in their [particular] context. Yet the observer may view that context quite otherwise from the actor: not only is his vantage point different, he may even have approached the scene with a preconceived notion—consciously or subconsciously—of what gestures he expected to see and what he expected them to mean. The potential for misunderstanding in such a situation is obvious." (*People* v. *Superior Court (Kiefer), supra,* 3 Cal.3d at p. 818, italics in original.)

· The conduct observed by Officer Povey involved animated conversation among four or five persons who had just left an apartment building, each leaving to go in different directions. Appellant walked briskly toward a nearby street. While the group was together, they were either talking, walking, or in a "huddle." Nothing was being concealed, disposed of, exchanged, or even carried. When they "huddled," they did so away from the elevator lobby and in plain view of the police officers. When they separated, they walked away on public sidewalks with no attempt to avoid the lighted, open portions of the area. There is little that is "furtive" about such behavior.

■ Respondent appears to argue it may reasonably be inferred that the individuals did not wish to encounter the approaching police officers

and that the detention in this case may be justified on that basis. However, this court has noted "[t]here are many reasons other than guilt . . . why an occupant of an apartment may not wish himself or others present exposed to the immediate view of a stranger, even if the stranger is a police officer." (*Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113].) Even where an individual is out of doors, his "apparent concern with privacy does not imply guilt." (*Cunha* v. *Superior Court, supra,* 2 Cal.3d at p. 357; accord, *Remers* v. *Superior Court, supra,* 2 Cal.3d at pp. 664-665.)

Consider *People* v. *Moore, supra,* 69 Cal.2d 674. There, a police officer observed a man making a telephone call from a public phone booth in an area of high narcotics traffic. When the man seemed to observe the officer, he "moved from a comfortable position in the telephone booth, and turned his back on the police car. Defendant appeared nervous. The officer thought that defendant 'was trying to avoid' him. . . ." So, considering also " 'the area and the surrounding circumstances,' " he detained him. (*Id.,* at p. 678.) This court held that detention invalid. "To hold that police officers should in the proper discharge of their duties detain and question all persons in that location or all those who act nervous at the approach of officers would for practical purposes involve an abrogation of the rule requiring substantial circumstances to justify the detention and questioning of persons on the street." (*Id.,* at p. 683.)

As *Moore* suggests, to accept the Attorney General's argument would also undermine the detention rules of the Fourth Amendment. In our society, private individuals are free to conduct their own lives, seeking to mingle with or to avoid whomever they please. They certainly are under no legal duty to submit to the attentions of another private person. Unlike a private party, however, a police officer does have the power to insist upon an encounter—that is, an officer has the power to "detain"—but only when he or she has adequate cause. Lacking such a basis, an officer may not detain an individual, and the individual, unless he or she is properly detained and so notified, is as free to avoid the officer as to avoid any other person. To hold that the mere exercise of this liberty justifies a detention would be tantamount to holding that an officer may insist upon an encounter without adequate cause.

It requires no novel doctrine of law to reject respondent's suggested inference. "The courts have . . . continually condemned any state practice which imposes adverse treatment on individuals for exercising constitutional rights intended to protect against such adversity. . . ."

(*People* v. *Miller* (1972) 7 Cal.3d 219, 225 [101 Cal.Rptr. 860, 496 P.2d 1228].) Indeed, in numerous contexts analogous to detention, this court has held that an outright refusal to cooperate with police officers cannot create adequate grounds for an intrusion which would otherwise be unjustifiable.[9] No reason is suggested why this principle does not apply with equal force to detentions. If the right to be free from unjustified detentions is lost merely by seeking to avoid such encounters, then the right is meaningless; it would exist only to the extent it was not exercised. Such a conclusion is unacceptable.

## III

The presence of a white man at night in a predominantly black residential area having an assertedly "high" crime rate is an inadequate basis on which to seize him under the Fourth Amendment. The other circumstances relied upon by the respondent to attempt to justify the detention were not in fact relied on by the officer and, in any event, were insufficient additional circumstances to warrant the intrusion. Therefore, appellant's motion to suppress should have been granted.[10]

The judgment is reversed.[11]

Tobriner, J., Mosk, J., Manuel, J., and Newman, J., concurred.

---

[9]See, e.g., *People* v. *Scott* (1976) 16 Cal.3d 242, 250 [128 Cal.Rptr. 39, 546 P.2d 327]; *People* v. *Wetzel* (1974) 11 Cal.3d 104, 108-109 [113 Cal.Rptr. 32, 520 P.2d 416]; *People* v. *Miller, supra,* 7 Cal.3d at page 225; *Gallik* v. *Superior Court* (1971) 5 Cal.3d 855, 861 [97 Cal.Rptr. 693, 489 P.2d 573]; *People* v. *Collins* (1970) 1 Cal.3d 658, 664 [83 Cal.Rptr. 179, 463 P.2d 403]; *Tompkins* v. *Superior Court, supra,* 59 Cal.2d at page 68.

[10]In seeking to uphold appellant's detention, the Attorney General and the trial court have pointed to—and our own research has uncovered—several Court of Appeal decisions whose results would appear to support a detention based on evidence more meager than that in the present case. (See, e.g., *People* v. *Moreno* (1977) 67 Cal.App.3d 962 [134 Cal.Rptr. 322]; *People* v. *Larkin* (1975) 52 Cal.App.3d 346 [125 Cal.Rptr. 137]; *People* v. *Higbee* (1974) 37 Cal.App.3d 944 [112 Cal.Rptr. 690].)

If the showings made in these cases were adequate to warrant a detention, then precious little freedom from detention would be left to residents of this state, and our law requiring "substantial circumstances to justify the detention and questioning of persons on the street" would be hollow. (Cf. *People* v. *Moore, supra,* 69 Cal.2d at p. 683.) Clearly, that is not the situation. The results of the cited Court of Appeal decisions are inconsistent with the results of the entire line of detention decisions of this court—culminating in *In re Tony C.*—and are hereby disapproved.

[11]In view of the conclusion that appellant's detention was unconstitutional, it is not necessary to reach the issue of the legality of the pat-down.

**CLARK, J.,** Dissenting.—To reach what they perceive to be an act of racial discrimination, the majority misstate the question presented by this case.

The question confronting us clearly is not "whether an officer may constitutionally detain a citizen because he is a white man who happens to be with a group of black men in a black residential area at 8:37 p.m." (*Ante,* p. 641.) Were this truly the question, our court would be unanimous in answering "No." However, other circumstances existed—in addition to that recited by the majority—leading the officers to detain and arrest defendant for being a felon in possession of a concealable firearm. (Pen. Code, § 12021.) The others, while mentioned in part by the majority in their statement of facts, are effectively ignored in later framing and analyzing the legal issue presented by the record.

Before discussing other factors supporting the detention, should we not dispassionately consider what the majority characterize as impermissible racial discrimination? Officer Povey had patrolled this black residential area of San Francisco for more than three years. With the exception of robbery victims, he testified he had never encountered a white person in the area on foot after dark for an "innocent purpose." White persons he had encountered were usually there to purchase narcotics. Of 500 arrests the officer had made, 20 were of whites—all for narcotics offenses. In brief, in Officer Povey's unfortunate experience, a white person does not risk entering this area on foot after dark unless to engage in unlawful activity.

Now this is a horribly distressing proposition. We deplore the conditions of urban life manifested in this record. However, in upholding our duty as an appellate court to view the evidence in light most favorable to the prevailing party below, we must accept the officer's testimony. To not do so in this case perpetrates a cruel hoax. For by closing our eyes to the record and by restricting law enforcement activity in this neighborhood, do we not condemn its law abiding residents to further inhumanity?

Let us turn to the circumstances justifying the detention—the group's backstairs behavior and defendant's flight.

The majority's summary of evidence distorts the scene. "The conduct observed by Officer Povey involved animated conversation among four or five persons who had just left an apartment building, each leaving to go in

different directions. Appellant walked briskly toward a nearby street. While the group was together, they were either talking, walking, or in a 'huddle.' Nothing was being concealed, disposed of, exchanged, or even carried. When they 'huddled,' they did so away from the elevator lobby and in plain view of the police officers. When they separated, they walked away on public sidewalks with no attempt to avoid the lighted, open portions of the area." (*Ante,* p. 647.)

Not mentioned is the fact that the group, having just gotten out of the elevator, immediately sought to reenter it after looking in the officers' direction. Omitted is the fact that when the group huddled, following their Keystone attempt to reboard the elevator, they looked in the officers' direction "every so often." Neglected is the fact that when one black man walked away from the group, in the opposite direction from the officers, "[h]e constantly was looking over his shoulder" at the policemen. Missed is the fact that when the officers advanced "maybe two steps" toward the group it "fragmented." Against this background, the significance of defendant's gait—characterized by the majority as "brisk" but by Officer Povey as a "very quick walk, almost a run"—is apparent, all suggesting judicial revisionism.

In denying the suppression motion, the trial judge concluded the detention was not based solely on the racial factor now isolated by the majority. The judge quite properly added that had he been asked to uphold the detention on that basis alone, he would have thrown the case out "as fast as those doors could swing."

The judgment should be affirmed.

RICHARDSON, J.—I respectfully dissent, concurring in the views expressed by Justice Clark and wishing only to add the following observations. As noted by Justice Elkington in his opinion for the Court of Appeal, there existed ample circumstances justifying both a limited detention and "pat-down" search for weapons. The detention occurred at night in a high crime area, after the suspects reacted furtively and evasively when they observed the officer approaching. Given both the officer's substantial police experience (having made at least 500 prior arrests) and the nature of his observations, he could reasonably conclude that some form of criminal activity was occurring which warranted further investigation.

In addition, in my view, the pat-down search for weapons was also proper under the circumstances. The officer testified that "there were numerous guns on the street at this time during this period. . . ." Indeed, he and his partner had recovered "at least five weapons during this period [i.e., one week] in this particular area." Because it was at night in a high crime area, the officer could reasonably believe on the basis of his recent experience that the suspects might be armed, and he so testified. A precautionary pat-down search seems to me entirely reasonable as a minimum protection against a surprise assault. As properly noted by Justice Elkington, "Where a police officer in the light of his experience concludes that a person with whom he is dealing may be armed and presently dangerous he is entitled for the protection of himself and others to conduct a carefully limited search of the outer clothing of such person in an attempt to discover weapons which might be used to assault him. [Citations.]"

In the present case, this pat-down search produced a loaded "six shot .38 Special revolver," confirming the officer's strong suspicion that defendant might be armed.

I would affirm the conviction.