[Civ. No. 6279. Fifth Dist. July 20, 1981.]

JAMES LESLIE CROFOOT, Petitioner, v.
THE SUPERIOR COURT OF STANISLAUS COUNTY,
Respondent;
THE PEOPLE, Real Party in Interest.

COUNSEL

Beaver, Solano, Allen, Goss & Reynolds and Lawrence C. Beaver for Petitioner.

No appearance for Respondent.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher and Jana L. Tuton, Deputy Attorneys General, for Real Party in Interest.

OPINION·

**BROWN (G. A.), P. J.**—Petitioner, James Leslie Crofoot, seeks a pretrial writ of mandate pursuant to Penal Code section 1538.5, subdivision (o), his motion to suppress in the trial court having been denied. We stayed the trial and issued an order to show cause.

Petitioner was charged with burglary (Pen. Code, § 459).

FACTS

Officer Reid of the Modesto Police Department testified in substance that at 3:30 a.m., while driving down McHenry Avenue on patrol, he

saw petitioner and codefendant, Rodney Stine, cross McHenry Avenue from east to west a short distance in front of his patrol car. Stine was wearing a backpack. When they came into the lights of the patrol car the individuals broke into a run across McHenry Avenue and onto the bank of an irrigation canal that runs perpendicular to the road. That portion of McHenry Avenue is located in an area which is a busy business district during normal business hours; adjacent to the canal is a residential area. After observing this behavior, Officer Reid quickly drove his automobile around the block and parked it off the road on Johnson Street, which apparently runs parallel to McHenry one block to the east. The officer turned off the vehicle lights and waited for a short while until the individuals emerged from the bushes along the bank of the canal onto Johnson Street. The two backpackers emerged from the bushes on Johnson Street right at the point where Officer Reid had parked his car. When questioned by defense counsel whether or not the defendants attempted to avoid the officer's car when they came out of the bushes, the officer explained: "They didn't have a chance to evade me. They walked right into me."

Codefendant Stine had a backpack on, the outside pockets of which were obviously bulging. He wore a blue vest, the right front pocket of which was also bulging. Part of a knife handle was visible out the top of the vest pocket. He was wearing a new cowboy hat. Petitioner Crofoot was also wearing a new cowboy hat. The pockets on a long-sleeved Levi jacket petitioner was wearing were also bulging. According to the officer, it was obvious that the pockets on the clothing the individuals wore, as well as the exterior pockets on the backpack, were filled with objects.

At that point the officer asked the individuals for identification. Stine replied that he had no identification but gave the officer his name. Petitioner showed the officer his driver's license. In answer to the officer's questions, Stine replied that they were coming from a friend's house and were going to a friend's house.

The officer then removed the visible fixed-blade "buck knife" from Stine's jacket pocket and a visible folding-blade "buck knife" from a scabbard on petitioner's belt.

Officer Reid testified the following conversation then took place:

"Q. [By the District Attorney] What were the next words spoken by either one of the three of you?

"A. [By Officer Reid] I think it was at that time that I asked Mr. Stine if he had any objections to my looking in the backpack that he was wearing.

"Q. At this point was the backpack still on him or had he taken it off?

"A. No, he was still wearing it.

"Q. What happened then?

"A. He asked me why. I told him that—I believe I said that we are—that we had a lot of burglaries in that area that they were coming from. And he asked me if I had a search warrant with me and I said no.

"Q. What was said next?

"A. I told him that he shouldn't have any objections to my looking in the backpack if he weren't doing anything. And I asked what his objection was to my looking in the backpack." [At the preliminary hearing, following this statement by the officer there occurred a long conversation between counsel for the parties and the judge, following which the examination continued.]

"Q. [By District Attorney] Can you answer the question?

"A. [By Officer Reid] 'None.'

"Q. Pardon me?

"A. 'None.'

"Q. What happened physically at that point?

"A. I asked him to take the backpack off, which he did. He then opened the side pockets."

Stine stated that although he removed the backpack from his back himself, he did not give the officer permission to search it, nor did he (that is, Stine) open up any portion of the backpack himself.

Officer Reid reached into the side pockets of the backpack and pulled out numerous pairs of new socks "still tagged together with the stickum labels." While he was reaching into the outside side pocket, Officer Reid stated that he felt other objects inside the main compartment of the backpack. At that point defendant Stine requested that the officer leave them alone. However, the search of the side pockets continued. Officer Reid stated that, at that point in time, he knew that he did not have consent to search the central portion of the backpack. Nonetheless, the officer stated that he attempted to untie the string for the main flap and, being unsuccessful, requested that Stine untie it for him. After Stine had untied the main flap, Officer Reid opened it up and discovered more socks, a chainsaw, boxes of knives and a carving set inside the main compartment of the backpack.

After searching Stine's backpack, the officer advised petitioner of his *Miranda* rights and thoroughly searched him, seizing another knife and several rolls of stamps found in his pockets. The items were later identified as stolen property.

At the time the scabbard knife was removed from petitioner's belt, which took place before the knapsack search, it is not clear from the record how many officers were present. The record shows that at some point in time two other officers arrived on the scene and were present during the search of the backpack and second search of petitioner's person. The scabbard knife was confiscated at the same time as was the fixed-blade buck knife which was visible extending out of the shirt pocket of codefendant Stine. Officer Reid stated that after he requested that the two backpackers identify themselves, he did not make a pat-down search for weapons, but simply removed the weapons that were visible on the two suspects. The suspects were not acting hostile toward him, but the officer stated he "always [had] concerns about [his safety]." The second body search took place after the knapsack had been searched. Officer Reid admitted, upon cross-examination, that he patted down both individuals and searched their pockets for the sole purpose of finding additional contraband. The second body search was the one which produced additional knives and stamps. Immediately after the second body search, the two individuals were placed under arrest, handcuffed and placed in separate patrol cars.

It is not argued that the officer did not have probable cause to arrest the two individuals at the time the arrests were made. (See *People* v. *Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632],

cert. den. *California* v. *Harris* (1976) 425 U.S. 934 [48 L.Ed.2d 175, 96 S.Ct. 1664].)

The central issues are the legality of the detention and whether the officers had the voluntary consent of Stine to search the backpack. We have concluded that the detention was legal but the consent was involuntary.

The burden is upon the real party to justify the warrantless search. (*People* v. *Hill* (1974) 12 Cal.3d 731, 747 [117 Cal.Rptr. 393, 528 P.2d 1], disapproved on other grounds in *People* v. *DeVaughn* (1977) 18 Cal.3d 889, 896 [135 Cal.Rptr. 786, 558 P.2d 872]; *Wilder* v. *Superior Court* (1979) 92 Cal.App.3d 90, 96-97 [154 Cal.Rptr. 494].)

To justify a detention, real party must show specific articulable facts which reasonably caused the officer to believe that "(1) some activity out of the ordinary had taken place or was occurring or about to occur; (2) the activity was related to crime; and (3) the individual under suspicion was connected to the activity." (*People* v. *Bower* (1979) 24 Cal.3d 638, 644 [156 Cal.Rptr. 856, 597 P.2d 115]; *In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) The stop is not justified if it is based on "mere curiosity, rumor, or hunch." (*Ibid.*) While the facts known to the officer which justify the detention need not amount to probable cause or actual belief in guilt required to arrest, the prosecution still must show that the officer personally entertained suspicions that were objectively reasonable. (*Ibid.*)

During the hearing on the suppression motion below and again on appeal petitioner relies heavily on the factual similarity of *People* v. *Bower, supra,* 24 Cal.3d 638. With respect to the second prong of the three-part test set forth *supra,* the *Bower* court noted that "the 'nighttime factor' is not 'activity' by a citizen, and this court has warned that this factor 'should be appraised with caution' [citation] and that it has, at most, 'minimal importance' in evaluating the propriety of an intrusion [citation]." (*People* v. *Bower, supra,* 24 Cal.3d at p. 645, fn. omitted [in the *Bower* case the detention there under judicial scrutiny took place at 8:37 p.m.].) Moreover, the *Bower* court also noted, with respect to the first prong of the three-part test, that "[t]he 'high crime area' factor is not an 'activity' of an individual. . . .[T]his court has appraised this factor with caution and has been reluctant to conclude that a location's crime rate transforms otherwise innocent-appearing circum-

stances into circumstances justifying the seizure of an individual. [Citations.]" (*People* v. *Bower, supra,* 24 Cal.3d at p. 645.)

■ However, the quantum of suspicious information known to Officer Reid at the time of the detention differentiates this case from *Bower.* First of all, the fact that the hour of the stop was at 3:30 a.m. adds something to the equation. And even though that fact alone is of "minimal importance," it is of some value given the other surrounding circumstances. The most distinguishing feature of this case, however, is the appearance of the individuals the officer detained. Unlike the *Bower* case, wherein the detaining officer testified that he had observed individuals and suspicious group activity, in this case the officer noticed that the pockets of the backpack and the clothing worn by the individuals were stuffed with objects, and that both were wearing new hats. This fact, combined with the officer's earlier observation that the individuals fled down a canal bank after observing his marked police car, makes the actions of the detaining officer more reasonable than that of the officers in *Bower*[1] and meets the prerequisite conditions for a valid detention.

The initial seizure of the visible knives following the detention of Stine and petitioner was justified for the officer's own protection. The officer testified he always felt concerned about suspects being armed. (See *People* v. *May* (1973) 33 Cal.App.3d 888 [109 Cal.Rptr. 396].)

As to the removal of the items from the exterior pockets of the backpack, real party relies upon the theory that Stine had voluntarily consented to the removal. Petitioner contends the consent, if any, was not freely and voluntarily given.

■ Real party had the "burden of proving that the defendant's manifestation of consent was the product of his free will and not a mere submission to an express or implied assertion of authority. [Citation.] The voluntariness of the consent is in every case 'a question of fact to be determined in the light of all the circumstances.' [Citations.]" (*People* v. *James* (1977) 19 Cal.3d 99, 106 [137 Cal.Rptr. 447, 561 P.2d 1135]; fn. omitted.)

---

[1]Moreover, as the dissenting opinion noted in *People* v. *Bower,* the *Bower* decision was at least in part motivated by some evidence in the record of that case revealing what the court construed as racial motivation for the detention. (*People* v. *Bower, supra,* 24 Cal.3d at pp. 650-652.)

■ Referring to the verbal exchange between the officer and Stine, and assuming the officer's inquiry as to whether Stine had any objections to looking inside the backpack to be a request for consent, Stine's response of "Why?" and inquiry as to whether the officer had a search warrant creates the clear inference that Stine did object to looking into the backpack. The officer nevertheless pressed further with "I told him that he shouldn't have any objections to my looking in the backpack if he weren't doing anything. And I asked what his objection was to my looking in the backpack."

We believe implicit in the officer's statement is the threat that by exercising his right to refuse the search Stine would be incriminating himself or admitting participation in illegal activity (that is, that he had been "doing something"). It was equivalent to putting the following option to Stine: "By exercising your constitutional right to withhold consent from me to search the backpack you will be admitting to me that you have done something wrong; it is better to let me search the pack and discover for myself. You cannot leave until you give consent." Thus, whatever consent was obtained was in fact "no more than acquiescence to a claim of lawful authority," that is, the defendant realized that a penalty attached to the exercise of his Fourth Amendment right to refuse consent to an illegal search.

Stine had a constitutional right to remain silent and refuse to give consent, and the denial by the officer of the exercise of that right at the risk of suffering an adverse inference to be drawn by the officer amounted to placing an unauthorized condition upon the exercise of the right.

We have found no case directly in point. The situation is analogous to the cases holding that no adverse inference can be drawn against a householder for exercising his Fourth Amendment rights by refusing consent to an officer to make a warrantless search. (*United States* v. *Prescott* (9th Cir. 1978) 581 F.2d 1343, 1350-1353.) As the court prophetically stated: "Yet use by the prosecutor of the refusal of entry, like use of the silence by the prosecutor, can have but one objective—to induce the jury to infer guilt. In the case of the silence, the prosecutor can argue that if the defendant had nothing to hide, he would not keep silent. In the case of the refusal of entry, the prosecutor can argue that, if the defendant were not trying to hide something or someone (in this case Duvernay), she would have let the officer in. In either case, whether the argument is made or not, the desired inference may be well

drawn by the jury. This is why the evidence is inadmissible in the case of silence. [Citations.]" (*Id.*, at p. 1352.) (See also *Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113]; *People* v. *Cressey* (1970) 2 Cal.3d 836, 841, fn. 6 [87 Cal.Rptr. 699, 471 P.2d 19].)

Because the purported consent was given under legal compulsion, it is deemed in law to be involuntary and cannot be relied upon as authorizing the search of the backpack.

After searching the outer pockets of the backpack and before entrance into its interior, Stine requested that the officer leave them alone. Nevertheless, the search into the interior continued, notwithstanding the officer's admission that at that point in time he knew that he did not have consent to enter the central portion of the backpack. The conclusion is inescapable that the search of the interior part of the backpack was illegal and unauthorized.

As to petitioner Crofoot, after the officer initially removed the visible knife and after searching Stine's backpack, he advised petitioner of his *Miranda* rights, patted him down, and searched him, seizing several rolls of stamps and another knife in his pocket. These items, together with the items seized from Stine, were later identified as being stolen from a nearby burglarized store.

The officer admitted that after removing visible knives from the two individuals, he patted them down and searched their pockets for the purpose of finding additional contraband. It follows that these latter searches were admittedly exploratory, without consent and unauthorized. Accordingly, the evidence must be suppressed.

Let a writ of mandate issue directing the suppression of all evidence, tangible and intangible, obtained as a fruit of the unlawful search and seizure. The stay order heretofore issued is vacated.

Franson, J., and Hanson (P. D.), J., concurred.