[No. A055219. First Dist., Div. Four. Aug. 11, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES EARL RIVERA, Defendant and Appellant.

## COUNSEL

Victor Blumenkrantz, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Mark S. Howell and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ANDERSON, P. J.**—Defendant James Earl Rivera (appellant) appeals his convictions for auto theft (Veh. Code, § 10851, subd. (a)) and attempted burglary (Pen. Code,[1] §§ 459/664). He claims that certain evidence supporting his arrest should have been suppressed pursuant to section 1538.5, since his arrest was accomplished without probable cause and by a police dog. He further claims that the court's admission of this evidence requires reversal of his convictions under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. We disagree and affirm.

## I. FACTS

On May 21, 1991, Oakland police received information "that a James Rivera was going to hit an A.T.M. on Hegenberger Road at approximately 4:00 o'clock in the morning," and that he would be armed.

Several Oakland police officers therefore began surveillance of automatic teller machines (ATM) located along Hegenberger Road during the early morning hours of May 22, 1991. One of the locations they monitored was the ATM at the City and County Employees Credit Union, located near the intersection of Hegenberger and Edgewater Roads. About 4:07 a.m., police observed two Black males arrive in a stolen Ford Mustang convertible. One of the suspects, wearing dark clothes, remained by the car as a lookout, while the other, who was as wearing light clothes, walked over to the ATM and started hitting it with a crowbar.

Officer Conner radioed the other surveillance units that the two suspects were forcing entry to the ATM. It was the first of many radio transmissions detailing the suspects whereabouts during the course of the police pursuit. The two suspects jumped into the car, with the light-clothed one at the wheel. He backed the car out of the parking lot and headed south. Officers Grubensky and Pourier, in a police stakeout vehicle, saw the Mustang heading south, and saw it crash into a hedge. Officer Grubensky saw the two men climb over the windshield and run across the hood of the car. He described the driver, whom he later identified as appellant, as being of medium build, about 5 feet 7 inches to 5 feet 8 inches tall, weighing 140 to 150 pounds and wearing light-colored shorts. The two men ran across a street and climbed over a fence. Officer Grubensky pursued, and saw them trudging through the water of an estuary. He observed them come out of the water, walk up an embankment, and climb over a fence into a nearby United Parcel Service (UPS) parking lot. Officer Grubensky communicated this information on the police radio.

---

[1]Unless otherwise indicated, all further statutory references are to the Penal Code.

In addition to 10 surveillance units already in the area, at least 10 additional police patrol cars were brought in. These cars, with their lights flashing, formed a perimeter. In setting up the perimeter, police officers repeated on the radio that the suspects were armed.

Officers Vierra and Hardman were also in the vicinity. Officer Vierra saw two Black males walking and then running near the UPS lot. He lost sight of the men, but broadcasted the direction in which they were running to other police units. Officer Hardman ran to a Pitney Bowes parking lot adjacent to the UPS parking lot and concealed himself behind a post. Hardman soon saw the men run in his direction and climb a fence into the Pitney Bowes yard. One, whom he ultimately identified as appellant, was wearing light-colored shorts and the other was wearing dark pants. Hardman broadcasted the suspects' description and location on the radio. He ran toward the men, and came within 20 to 25 feet of them. He noticed that appellant was not wearing a shirt and was very dark complected. Hardman yelled, " 'Police. Freeze," and ordered the men to the ground. The men ran, and Hardman pursued. When the suspects went over another fence, Hardman was about 10 feet from them. He noticed that appellant was wearing black topsider deck shoes, and wore his hair in cornrows or braids.

The suspects then split up: the man in dark pants climbed a fence into a post office parking lot, where he was apprehended. Appellant crossed a field heading toward the parking lot of the Hilton Hotel.

Officer Garrahan and his police dog, Gitan, had been dispatched to the burglary area and assigned to a perimeter post. Since 4:15 a.m., Officer Garrahan had been listening to radio updates about the suspects' where-abouts. At 4:45 a.m., Officer Garrahan was requested to conduct a search with Gitan of an area of shrubs and trees along the south edge of the Hilton Hotel property, the area to which appellant was last spotted running. Police had already searched the area; Officer Garrahan did not see anyone in the vicinity. Officer Garrahan had been informed by radio that the suspect he was searching for was a Black male, about 25 years old, wearing white shorts and no shirt and that he was armed with a .9-millimeter handgun. Because he believed the suspect was armed, Officer Garrahan wanted to have the element of surprise on his side. He therefore released Gitan without issuing a "canine anouncement,"[2] which would have warned those present of the imminent threat the dog presented. Officer Garrahan gave the dog the command "Such Fass" (search and bite).

---

[2]Officer Garrahan testified that the Oakland Police Department canine warning is as follows: "This is the Oakland Police Department Canine Unit. Give yourself up before I release the dog. He will find you, and he will bite you."

Gitan followed his orders. He quickly picked up a scent and went into the bushes. Soon Officer Garrahan heard someone yelling, and he called out, "Get your hands up. Get your hands up." Officer Garrahan saw Gitan attempting to pull appellant out of the bushes. The dog had bitten and locked his jaws across the top of appellant's scalp. Officer Garrahan could only see appellant's right hand and still feared he was armed. He therefore called out, "Get your hands up where I can see them. . . . I can't call the dog off until I can see your hands."

When the dog pulled appellant further out, Officer Garrahan could see that appellant was unarmed, and he called off the dog. Gitan had bitten and held onto appellant for approximately 15 seconds. Officer Garrahan noticed that appellant matched the description of the burglary suspect: He was the right age, wearing pale shorts and no shirt, and was apprehended in an area consistent with the burglar's direction of flight; accordingly, he arrested and handcuffed appellant. Appellant was subsequently identified by Officers Grubensky and Hardman shortly thereafter.

## II. Discussion

On appeal appellant claims that the trial court erroneously denied his motion to suppress evidence (i.e., the police identifications and his clothes), which was obtained as a result of his arrest. He asserts that this evidence was obtained wrongfully, since he was arrested without probable cause. Since the prosecution relied heavily on this evidence, he claims reversal is required under *Chapman.*

Appellant has two main contentions we must address: First, he contends that he was arrested at the time he was bitten on the head by Gitan and thereby was prevented from moving by Gitan. Second, he contends that this "arrest" was made without probable cause. That Gitan himself lacked probable cause does not determine the issue; both sides agree that he should be considered an instrumentality of Officer Garrahan. Appellant claims Officer Garrahan lacked probable cause, since the facts known to him at the time of the arrest were not sufficiently "person-specific."

■ "An appellate court's review of a trial court's ruling on a motion to suppress is governed by well-settled principles." (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].) On appeal the factual findings of the lower courts are upheld if supported by substantial evidence. (*People* v. *Siripongs* (1988) 45 Cal.3d 548, 567 [247 Cal.Rptr. 729, 754 P.2d 1306].) However, appellate deference is not accorded to the selection of the relevant legal principle or its application to the facts as found.

Both steps present questions of law which are scrutinized under the standard of independent review. (*People* v. *Williams, supra*, at p. 1301.) Independent review is appropriate because it is "the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness." (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].)

We, therefore, independently review the trial court's acceptance of appellant's first contention (that he was arrested at the time he was bitten by Gitan), and rejection of his second (that the arrest was made without probable cause). We find both contentions lacking, and uphold the trial court's ruling.

### A. *Appellant Was Detained, and Not Arrested, by Gitan*

■ California cases have long recognized that "circumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the streets for questioning." (*People* v. *Mickelson* (1963) 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658].) To protect his safety, the officer may also be justified in requesting a suspect to submit to a superficial search for concealed weapons. (*Terry* v. *Ohio* (1968) 392 U.S. 1, 27 [20 L.Ed.2d 889, 909, 88 S.Ct. 1868].) The guiding principle in these temporary investigatory stops, as in all Fourth Amendment issues, is "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." (*Id.*, at p. 19 [20 L.Ed.2d at p. 904].)

Determining the reasonableness of a detention is a two-fold process: First, the court must determine whether the officer's action was "justified at its inception." Second, it must determine whether the manner in which the detention was carried out was "reasonably related in scope to the circumstances which justified the interference in the first place." (*Terry* v. *Ohio, supra*, 392 U.S. at pp. 19-20 [20 L.Ed.2d at p. 905].) The first prong of this test is satisfied if the officer has an "objectively reasonable" suspicion, based upon specific and articulable facts that (1) a crime has occurred, and (2) the person he intends to detain is involved in the criminal activity. (*In re Tony C.* (1978) 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) Appellant does not contend that this first prong was not satisfied in the present case. As we discuss more fully below, we find the facts known to Officer Garrahan justified not only appellant's detention but his arrest. Appellant does contend, however, that he was a victim of a canine "interference" which was not reasonably related in scope to the circumstances.

■ The courts have long recognized that an investigative detention may, at some point, become so overly intrusive that it can no longer be characterized as a minimal intrusion designed to confirm quickly or dispel the

suspicions which justified the initial stop. (*In re Carlos M.* (1990) 220 Cal.App.3d 372, 384 [269 Cal.Rptr. 447], citing *United States* v. *Sharpe* (1985) 470 U.S. 675, 686-687 [84 L.Ed.2d 605, 615-616, 105 S.Ct. 1568].) At that point what started as a detention may be converted into an arrest, which must then be justified by probable cause. While there is no hard and fast line to distinguish permissible investigative detentions from impermissible de facto arrests, the use of force has been found to be a crucial factor. (*People* v. *Campbell* (1981) 118 Cal.App.3d 588 [173 Cal.Rptr. 442].)

■ Appellant contends that the amount of force applied by Gitan in the present case transformed what would have been a lawful detention (requiring less than probable cause) into an arrest (requiring probable cause). He relies on *People* v. *Campbell*, *supra*, 118 Cal.App.3d at page 595-596, which held that "Even if the police do not formally arrest a suspect, that suspect may nevertheless be under actual arrest if the restraint employed by the police goes beyond that which is reasonably necessary for a detention."

Appellant also relies upon *United States* v. *Ceballos* (2d Cir. 1981) 654 F.2d 177, which held that the police blocking of a suspect's car and their approaching him with guns drawn was so intrusive as to be tantamount to arrest. However, the *Ceballos* court reaffirmed that the question of whether police conduct is intrusive enough to amount to an arrest "must be resolved based on the particular facts of th[e] case" (*id.*, at p. 182); it found that "the officers articulated no facts which they viewed as creating a need for the use of force," and that such a need had not been "precipitated by the actions of the detainee." (*Id.*, at pp. 183-184, fn. omitted.)

In the present case Officer Garrahan articulated a very good reason for using force—a reason not disputed by appellant: he reasonably believed appellant was armed, and he knew appellant was fleeing the scene of the crime. Officer Garrahan reasonably feared for his safety, and that of others in the area. His own testimony conveys the danger of the situation: "I've got to be more careful, use more cover and concealment, and I don't want to advertise my approach to this person. If, in fact, they are armed, I'm conceivably setting myself up, particularly in an instance where this person has been fleeing from the police." Officer Garrahan stated that he hoped that by using Gitan to search, bite and hold appellant, he could "alleviate any shooting circumstance." To say the least, this was a prudent goal, and we hold that the means Officer Garrahan employed to accomplish it—a bite and hold by Gitan—was reasonable under the circumstances.[3]

"Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." (*Terry* v. *Ohio*, *supra*,

---

[3]As noted by the federal district court in *Chew* v. *Gates* (C.D.Cal. 1990) 744 F.Supp. 952, 957 (a civil action for damages under 42 U.S.C.A. § 1983), "the use of a police dog to search

392 U.S. at p. 23 [20 L.Ed.2d at p. 907].) With the escalation of drug-related violence, especially in large cities such as Oakland, their job is difficult and dangerous enough already. "[I]f, in the course of enforcing a lawful detention, the steps taken by our peace officers to guard their own safety, and that of the public at large, are reasonable, their exercise does not elevate the amount of 'probable cause' required to justify the detention itself. [Citations.] That is to say, society cannot in good conscience require those it employs to enforce its laws to choose between (1) placing their own lives in peril or (2) ignoring their sworn duty to investigate apparent criminal activity." (*People* v. *Coston* (1990) 221 Cal.App.3d 898, 903 [271 Cal.Rptr. 25].)

Finally, appellant relies upon section 835, which provides that "An arrest is made by an actual restraint of the person." It was Gitan's forcible restraint of appellant which persuaded the trial court that the police action amounted to an arrest: "It would be hard to argue that [appellant] was not arrested when this agent of the police grabbed him by the scalp and made it impossible for him to leave."

However, contrary to the language of section 835, case law teaches that physical restraint does not convert a detention into an arrest if the restraint is reasonable under the circumstances. Thus, removal of a suspect from a hostile crowd to a police station was permitted, where the crowd presented a threat to the officer's safety. (*People* v. *Courtney* (1970) 11 Cal.App.3d 1185, 1192 [90 Cal.Rptr. 370].) Handcuffing and transporting a suspect to a "show-up" with the victim was permitted, where this was the "only option reasonably available." (*In re Carlos M., supra,* 220 Cal.App.3d at p. 383.) Despite the express language of the statute, the test is not whether or not there is a physical restraint of the suspect, but whether the "particular governmental invasion of a citizen's personal security" was reasonable "in all the circumstances." (*Terry* v. *Ohio, supra,* 392 U.S. at p. 19 [20 L.Ed.2d at p. 904].) In the present case, we hold that it was. Finally, we note that it is a bit ironic for a suspect whose flight has necessitated the use of force to complain of it, when he could have avoided its employment by simply complying with the police command to halt.

B. *Officer Garrahan Acted With Probable Cause*

 Even were we to hold that Gitan's biting and holding of appellant constituted an arrest, we find it to be an arrest supported by ample probable

---

for and apprehend a suspect under such circumstances [when the suspect is involved in a serious crime, poses a threat to police officers or others, and is evading arrest] may actually reduce the overall risk of excessive force."

cause. Appellant does not claim that Officer Garrahan lacked cause to arrest him after the officer had determined appellant "matched the description" of the burglar. He claims only that at the time Officer Garrahan released Gitan, the facts known to the officer were not sufficiently "person-specific" to justify arrest—i.e., the officer could not see appellant, did not know who was in the bushes, or whether any person therein had committed any crime.

Probable cause for arrest exists when the facts known to the arresting officer " 'would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.' [Citations.]" (*People* v. *Harris* (1975) 15 Cal.3d 384, 389 [124 Cal.Rptr. 536, 540 P.2d 632].) We hold that this standard was met in the present case.

At the time that he released Gitan, Officer Garrahan knew that two suspects had been observed by police officers attempting to break into an ATM one-half hour earlier. He knew that since that time police had given chase and kept the suspects under almost continuous observation. He knew that 10 surveillance units and at least 10 other patrol cars, with their lights flashing, had formed a perimeter to contain the suspects. He knew that the area he had been assigned to search was consistent with the direction of the suspects' flight and that the area was within the perimeter set up by responding officers. He knew that other police officers had been ordered out of the area he was to search, and he did not see any civilians in it. Finally, he had been told that one suspect was armed.

Officer Garrahan did not know for certain whether appellant or anyone else actually was hiding in the bushes. Appellant therefore claims that Officer Garrahan lacked probable cause, since the facts known to him at the time failed to distinguish him from any other citizen at that time and place. (*People* v. *Bower* (1979) 24 Cal.3d 638 [156 Cal.Rptr. 856, 597 P.2d 115].)

However, *Bower* and the other cases cited by appellant are clearly distinguishable, since they all address whether police may detain or arrest one or more members of a "suspect class." (1 Lafave, Search and Seizure: A Treatise on the Fourth Amendment (2d ed. 1987) § 3.2(e), p. 587.) The prime example of a suspect class would be a group of people who all fit the description of the suspect, such as the three Black men, all of whom fit the general description of the rapist and were arrested in *Mallory* v. *United States* (1957) 354 U.S. 449 [1 L.Ed.2d 1479, 77 S.Ct. 1356], a case relied upon by appellant. Other suspect classes which are insufficiently "person-specific" to justify an arrest of one or all of their members include the proprietors of Chinese laundries on Leavenworth Street in San Francisco. (*Wong Sun* v. *United States* (1963) 371 U.S. 471 [9 L.Ed.2d 441, 83 S.Ct. 407].)

In the present case we have no indication in the record that the "suspect class" of which appellant was a member (individuals hiding in the bushes in a field within a police search perimeter at 4:45 in the morning) included anyone but appellant. We, therefore, are unwilling to hold that the mere possibility that the dog might have bitten someone completely innocent of wrongdoing, or no one at all, means that Officer Garrahan acted without probable cause. "In dealing with probable cause, . . . we deal with probabilities." (*Brinegar* v. *United States* (1949) 338 U.S. 160, 175 [93 L.Ed. 1879, 1890, 69 S.Ct. 1302].) We hold that the probability that Gitan would find appellant hiding in the bushes, and no one else, was high enough to justify Officer Garrahan ordering the dog to search and bite.

The judgment is affirmed.

Perley, J., and Reardon, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 12, 1992.