**UNITED STATES of America, Plaintiff,**

v.

**Robert David VILLARD, Defendant.**

**Crim. No. 87-326.**

United States District Court,
D. New Jersey.

Feb. 11, 1988.

Samuel A. Alito, Jr., U.S. Atty. by Howard Wiener, Asst. U.S. Atty., Office of U.S. Attorney, Camden, N.J., for plaintiff.

Roger Jon Diamond, Hecht, Diamond & Greenfield, Pacific Palisades, Cal., for defendant.

## OPINION

RODRIGUEZ, District Judge.

### PROCEDURAL HISTORY

This matter comes before the court on the motion of defendant Robert Villard for an order suppressing certain evidence seized from defendant's residence in Van Nuys, California, on September 9, 1987 pursuant to a search warrant issued by a municipal court judge in California. The facts regarding the search of defendant's apartment were ascertained in a preliminary hearing held before this court on November 20, 1987. At that hearing, William H. Dworin, a detective and United States Deputy Marshal assigned to a multi-agency sex crimes task force in Los Angeles, California, testified. Detective Dworin was one of the officers who arrested the defendant in California for the federal charges pending here. Subsequent to that arrest, the detective prepared a state warrant for the search of the defendant's apartment. Detective Dworin was also the principal officer involved in executing the warrant. The detective also testified as an expert on child pornography and the behavior of pedophiles. (Tr. at 3–5).

### FACTS

On September 9, 1987, Detective Dworin accompanied Special Agents Michael Randolph and Alan Rogers of the F.B.I. to the defendant's apartment in Van Nuys. They were armed with an arrest warrant based on federal indictments issued in New Jersey. The indictments allege that the defendant transported child pornography across state lines.

The officers knocked on Mr. Villard's apartment door at approximately 7:20 a.m. Villard appeared at the door in a bathrobe and was told that the officers had a war-

rant for his arrest. The three officers followed Villard into his apartment so that the defendant could dress. Detective Dworin proceeded into the two back rooms of the apartment, a bedroom and a den, in order to ensure that they were empty of persons who might present a threat to the officers. This included a look into closets to insure that no one was concealed there. The detective observed a young male asleep on the floor of the defendant's bedroom. Detective Dworin had previously investigated the defendant regarding the possible exploitation of children and had entered the defendant's apartment on at least two previous occasions since 1980. On both of those occasions there had been juveniles engaged in legitimate photo sessions in Villard's apartment and further investigation had determined that no illegal activity had taken place with respect to those juveniles. (Tr. at 6, 80).

Having ascertained no threat to the officers, the detective awakened the young male, who was fully dressed. The boy indicated that he was a fifteen year old model and that he had obtained his mother's permission to remain overnight at the defendant's apartment following a late photography session. The detective knew that the defendant is self-employed as a child agent and photographer. The boy further indicated, under questioning, that he had not been molested in any way. Based on his experience in the field, the detective believed the boy's statements. (Tr. at 11–12). The detective directed the boy to call home on a telephone located on a nightstand by the bed. While the boy spoke to his mother, the detective stood by, waiting to speak to her when the boy was finished.

Detective Dworin stood between the bedroom doorway and the bedroom closet doorway, which are in close proximity to one another on the same wall, opposite the bed. The sliding closet door was ajar, possibly as a result of the cursory inspection of the premises which the detective had conducted. Detective Dworin testified that while he was standing there waiting to speak to the boy's mother, he was just "looking around." (Tr. at 17). Within the closet, on a shelf recessed approximately one and a half feet from the closet door, he observed

a black "notebook" type ring binder. (Exhibit G–4). The binder was open on the shelf, which is approximately five-feet nine inches from the floor. The binder was stacked on top of some other items which were a few inches high. The binder was apparently located in a position on the right side of the shelf so that the right portion of the binder was at least partially behind the wall of the closet and the left cover of the binder was within the closet doorway. (Exhibit G–1). The sliding closet door emerges from the right door jam. (Exhibit D–1). The door was "ajar," but there was no testimony regarding how far it was open, or to what extent it obscured the binder. (Tr. at 18).

The detective is approximately six feet in height and the binder was at approximate eye level to him. He observed there were pages of photographic slides stacked on the right cover of the binder. Some of the pages were attached to the binder rings. A few were lying on top, unattached. The detective could not ascertain the content of these slides whatsoever from his vantage point. (Tr. at 18–21; Exhibit G–4).

The detective lifted the top-most loose page of slides, removed it from the closet, held it up to the light and viewed it "casually." (Tr. at 26). One slide, the third from the top left, caught his eye. He observed it to be a slide of two juveniles, nude, and apparently engaged in sexual activity. (Tr. at 29). On direct exam, the detective described his viewing of the page of slides as follows:

Q. Now, you see that slide. Do you look to see what the other slides look like?

A. Once I saw that one slide, that jumped out at me, I stopped. Basically stopped looking, put the slide away.

Q. You say you put the slide away. What did you do with them?

A. I put them back in the book.

Q. Then what did you do?

A. I notified the two agents that I was going to seek a state search warrant. And that the residence had to be secured.

(Tr. at 30).

On cross examination the detective elaborated:

Q. Based upon *Arizona versus Hicks* and based upon your knowledge of search law, do you believe that now in retrospect what you did was proper?

A. Yes, I do. I did not search, move items to search for serial numbers to be called in. I wasn't looking in fact for child pornography or child exploitation. I was there. It was movement, I made a movement, looked at the material, and I stopped right then. I felt that if I had continued to look and study that material, that would have been a search. I didn't. I felt that there was sufficient from what I saw at a casual glance. I felt that was like a plain sight view. And that was what was on my mind.

Q. Now I believe it's your testimony that you saw only one picture?

A. One that stood out, yes.

Q. Well, but your, your affidavit for the search warrant says and I'll read from it. Your affiant viewed on one of the loose sheets of slide and observed it to contain numerous slides depicting one and two male juveniles under 12 years of age nude and what appeared to be in explicit acts. That's correct?

A. One stood out. The others I viewed but I didn't study.

Q. Well, I thought a moment ago you testified that as soon as you saw one, you quickly put it back so as not to be accused of engaging in a search?

A. When you hold a set of slides up, you have your view of, is of the total. One stood out. And if you you'd like to hold one up and see that—

Q. But is it true you saw numerous slides depicting one and two male juveniles

A. Yeah, 16 of them.

.  .  .  .  .

Q. Now if you were simply glancing at this to kill time and only wanted to see what had happened, what was there, why wouldn't you have put it down before you saw the numerous slides?

A. Because I held them all up at once. I saw it in total and what I saw one slide stood out showing what I believe to be sexual exploitation.

Q. You indicated right after that in your affidavit, you said your affiant had conducted prior investigations of Villard, was aware that Villard did photograph juveniles in nude poses. Do you recall writing that?

A. Yes.

Q. So when you happened to pick up this Exhibit Five, containing all of these slides, it wasn't simply to pick up whatever happened to be lying around like an issue of Time Magazine or Reader's Digest. You were going for exactly what you had been investigating Mr. Villard for and on prior occasions?

A. No. I was just there, and I picked this one up. I can't justify why I picked it up. It was there. I was looking around. I picked out, that one up and that's what I saw.

Q. You are saying it's just a coincidence that you happened to pick up an item that you had previously investigated Mr. Villard for?

A. That's the way it goes, yes.

Q. You had to go to the trouble of actually viewing it by holding it up to the light, did you not?

A. Yes.

Q. You admit that you could not see what it was by simply looking in the closet?

A. That's correct.

(Tr. at 116–119).

After returning to his office, the detective prepared a search warrant and executed an accompanying affidavit. Therein, he testified as to his years of experience and expertise in the investigation of pedophiles and child exploiters. This included his awareness that such persons frequently use photographic materials to entice children and to lower their inhibitions. The detective also related his episode with the slides in defendant's apartment:

"While the juvenile was speaking to his mother on the telephone, your affiant observed an open notebook on the closet shelf next to where he was standing. Your affiant noted several loose slide sheets laying on top of the bound sheets

of slides. Your affiant viewed one of the loose sheets of slides and observed it to contain numerous slides depicting one and two male juveniles, under 12 years of age, nude and what appeared to be sexually explicit acts.

Your affiant had conducted prior investigations of Villard and was aware that Villard did photograph juveniles in nude poses. The photographs observed by our affiant on September 9, 1987 appeared to have been taken in Villard's residence.

Your affiant therefore says that there is probable and reasonable cause to believe that the items requested to be seized are items which tend to show that the sexual exploitation of children had been committed. To wit Section 311.3 of the Penal Code of the State of California."

(Exhibit G–6).

The detective took the warrant to a municipal magistrate, who approved it without comment. (Tr. at 53–54). Accompanied by Officer Hector Esparza, the detective returned to the defendant's apartment and executed the search warrant. The detective directed Officer Esparza to search the defendant's bedroom.

As part of his search of the bedroom, Officer Esparza seized the front and back cover of a magazine called "Wonderboy." (Tr. at 105). Although the officer apparently did not know it, the "Wonderboy" magazine cover was the subject of the federal indictment for which Mr. Villard had been arrested earlier that day. *Id.* The officers also seized a wide range of photographic materials and personal effects of the defendant. To date, no charges have been brought against Villard in California as a result of any of the seized items, including the slide sheet which the detective had viewed at the time of Villard's arrest. Upon viewing those slides further, the detective determined that no exploitation had taken place and that no California statute had been violated. (Tr. at 128). However, the materials seized were turned over to federal authorities for use in this case. *Id.*

## OPPOSING ARGUMENTS

The defendant asserts that the evidence seized from his apartment must be suppressed. The defendant argues that Detective Dworin conducted an illegal search of defendant's apartment by reaching into defendant's closet, picking up a sheet of photographic slides and holding them up to the light to view their contents. The defendant relies on the United States Supreme Court's decision in *Arizona v. Hicks*, 480 U.S. ——, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987).

The government asserts that the facts of this case are distinguishable from those in *Arizona v. Hicks*. At the preliminary hearing, however, the government emphasized an alternative approach. The government maintains that even if *Arizona v. Hicks* would invalidate the initial "search" of the slides by the detective, the subsequent seizure of evidence pursuant to a search warrant was proper under the "good faith exception" established in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

The defendant counters by arguing that in this case the issue is not a lack of probable cause to support the search warrant, as in *Leon*, but rather the fact that the information on which the search warrant was based was obtained as the result of a prior illegal search. Therefore, the defendant maintains that *United States v. Leon* is inapplicable to the facts of this case.

## ANALYSIS

### THE SEARCH

In *Arizona v. Hicks*, a bullet had been fired through the floor of an apartment and had injured a person in the apartment below. Under those exigent circumstances, police officers entered the apartment from which the bullet had issued. Upon entering the "squalid" apartment, the officers seized three weapons, including a sawed-off rifle. One of the officers then observed some expensive stereo equipment. The officer was able to read some of the serial numbers without moving the equip-

ment. However, he had to lift one turntable and look underneath it in order to observe its serial number. *Hicks,* 107 S.Ct. at 1152.

The officer ascertained by phone that the serial number was that of a turntable which had been reported stolen in an armed robbery. It was later learned that some of the other serial numbers also matched those of equipment stolen in the same robbery. The officer thereupon obtained a search warrant and seized the equipment.[1] *Id.*

An indictment for the armed robbery followed. An Arizona trial court suppressed the evidence seized from the apartment. The Arizona Court of Appeals affirmed. The appellate court found that while the initial entry and search were justified by the exigent circumstances of the gunshot, obtaining the serial numbers constituted an additional and unjustified search. *Hicks,* 107 S.Ct. at 1152.

The United States Supreme Court affirmed. The Supreme Court found that lifting the turntable to ascertain its serial number constituted a search. The Court stated:

Merely inspecting those parts of the turntable that came into view during the [search for the shooter, weapons and possible victims] would not have constituted an invasion of respondent's privacy interest. See *Illinois v. Andreas,* 463 U.S. 765, 771 [103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003] (1983). But taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion

of respondent's privacy unjustified by the exigent circumstance that validated the entry.... [T]he "distinction between 'looking' at a suspicious object in plain view and 'moving' it even a few inches" is much more than trivial for purposes of the Fourth Amendment. it matters not that the search uncovered nothing of any great personal value to the respondent—serial numbers rather than (what might conceivably have been hidden behind or under the equipment) letters or photographs. A search is a search, even if it happens to disclose nothing but the bottom of a turntable. *Hicks,* 107 S.Ct. at 1152–1153.

The Court further ruled that, in the absence of probable cause to believe that the equipment was stolen, such a search was not reasonable under the Fourth Amendment. *Id.* at 1153. The Court refused to classify the search of the turntable as a mere "cursory inspection" which could be carried out on the basis of reasonable suspicion and in the absence of probable cause. The Court stated: "We are unwilling to send police and judges into a new thicket of Fourth Amendment law, to seek a creature of uncertain description that is neither plain-view inspection nor yet a 'full-blown search.'" *Id.* at 1154.

The majority, in response to Justice Powell's dissent, discussed what appropriate action the officer in *Hicks* could have taken:

The answer depends, of course, upon whether he had probable cause to conduct a search.... If he had, then he should have done precisely what he did. If not, then he should have followed up

---

1. While the majority indicates that the officer seized the turntable immediately and returned later with a warrant to seize the remaining equipment, *Hicks,* 107 S.Ct. at 1152, a dissenting opinion indicates that the turntable was actually seized later as part of the warranted search. *Hicks,* 107 S.Ct. at 1156 (Powell, J. dissenting). The Arizona Appeals Court opinion which the Supreme Court affirmed seems to indicate that all of the equipment was seized pursuant to the search warrant, *State v. Hicks,* 146 Ariz. 533, 707 P.2d 331, 332 (1985), and that all of the stereo equipment was suppressed. *Id.* at 332. The resolution of this apparent factual discrepancy will not affect our application of *Hicks* to this

case. The Supreme Court in *Hicks* affirmed the suppression of all evidence which resulted from the conduct of picking up the turntable to view its serial number. *Hicks,* 107 S.Ct. at 1152 (citing *State v. Hicks,* 707 P.2d at 332–333). That would include the turntable itself, and by analogy, the page of slides which Detective Dworin initially viewed in this case. In the present case, since Detective Dworin ended his search immediately after viewing the first page of slides, all of the evidence subsequently seized by warrant resulted from the conduct of viewing that page of slides. Therefore, the ruling in *Hicks,* if it applies at all, will apply to all of the evidence seized in this case.

his suspicions, if possible, by means other than a search—just as he would have had to do if, while walking along the street, he had noticed the same suspicious stereo equipment sitting inside a house a few feet away from him, beneath an open window. It may well be that, in such circumstances, no effective means short of a search exist. But there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all.

*Id.* at 1155.

■ The ruling in *Arizona v. Hicks* is applicable to the case at hand. Detective Dworin, having gained access to defendant's apartment for the legitimate purpose of arresting him with a warrant, proceeded to engage in what amounted to an unauthorized search of the defendant's personal effects. When the detective removed the page of slides from the closet and held it up for viewing, he conducted precisely the type of search which was invalidated in *Hicks*.

Even if the edge of the page of slides was in clear view, the detective lacked the probable cause needed to lift the page and ascertain its contents. The detective knew that the defendant was a photographer. He had been in the defendant's apartment twice before and knew that it contained photographic equipment, including slides of innocent activity. The detective had already determined that the young boy in the apartment had not been molested and was there voluntarily for a legitimate photo session. The detective had, on previous visits to defendant's apartment, encountered other young boys who were likewise engaged in legitimate photo sessions and who had

not been molested. Further, he had ascertained this boy's age to be fifteen, and knew that California law did not prohibit the production of explicit photos of a person over the age of fourteen. (Tr. at 95–98).[2]

The detective was quite clear in stating that he lacked anything remotely approaching probable cause when he lifted the sheet of slides from the closet:

Q. Mr. Dworin, based upon your prior experience with my client, did you not at least have a suspicion that he might be involved in some sort of child pornography activity?

A. Both child pornography and child molestation, yes, I had a suspicion.

Q. You had a suspicion. But you did not have evidence?

A. That's correct.

Q. Also you did not have probable cause?

A. For what?

.　　.　　.　　.　　.

Q Did you believe in particular case [sic] that you had probable cause to believe that Mr. Villard was engaged in child pornography?

A. At that time? At what point?

Q. When you first entered the home?

A. Child pornography?

Q. Right?

A. I was aware that he was indicted for, on a child pornography charge.

Q. That's all you were aware of?

A. That's correct.

Q. And you didn't know anything else about the case except that it had came [sic] from Pennsylvania, is that right?

A. That's correct.

.　　.　　.　　.　　.

**2.** California Penal Code Section 311.3(a) states: "A person is guilty of sexual exploitation of a child when he or she knowingly develop, duplicate, print, or exchange any film, photograph, video tape, negative, or slide in which a person under the age of 14 years engaged in an act of sexual conduct." Cal.Penal Code § 311.3(a) (West Supp.1987).

Section 1524 of the California Penal Code specifically states that:

"(a) A search warrant may be issued upon any of the following grounds:

(5) When the property or things to be seized consist of evidence which tends to show that sexual exploitation of a child, in violation of Section 311.3, has occurred or is occurring." Cal.Penal Code § 1524 (West 1982).

Detective Dworin cited sections 311.3 and 1524 as the basis for the search warrant he obtained after viewing the page of slides. (Exhibit G-6).

Q. Okay, based upon that, did you have probable cause to believe that he was involved with child pornography in California?

A. I had suspicion, but no probable cause. No.

Q. Okay. And when you reached to look for that slide which is Exhibit Five, the slide sheet, you were suspicious, were you not?

A. I was suspicious when I went in, but I had no knowledge of what that slide would be. Nor did I expect any, to see what I saw.

Q. But when you pulled it off the shelf and held it up to the light, you were suspicious, were you not?

A. As soon as I held it up to the light. I had probable cause at that time.

Q. Before you held it up to the light, but while you were, you extracted it from the shelf, were you suspicious of what it might show? Isn't that right?

A. I had no idea what it might show. I had nothing in my mind other than my own knowledge of Mr. Villard, what might be on that slide.

Q. You had a suspicion, did you not?

A. I couldn't even say I had a suspicion.

(Tr. at 113–114).

■ Therefore, it is clear that the act of moving the slide sheet "even a few inches" in order to view its contents, was a warrantless search of defendant's premises. *Hicks*, 107 S.Ct. at 1152. In the absence of probable cause, that search was improper and the resulting evidence must be suppressed. *Id.* at 1154. The government has not asserted and the facts do not support any contention that the search was valid because it was incident to the lawful arrest of the defendant. The defendant was not in the bedroom at the time of the search, and the closet shelf was not within his reach. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

## THE GOOD FAITH EXCEPTION

Detective Dworin used the information he had gained from the search of the slides to obtain a search warrant from a municipal magistrate. The government is assert-

ing that the detective executed that warrant in good faith. Therefore, the government maintains that the warranted search should be upheld under the "good faith exception" to the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

In *Arizona v. Hicks*, the Supreme Court affirmed the suppression of evidence seized under a warrant which was based on evidence uncovered in a prior, illegal search. The Arizona Court of Appeals had specifically rejected the argument that the evidence should be admitted under the good faith exception. *State v. Hicks*, 707 P.2d at 332–33. However, the Supreme Court did not grant certiorari on that issue and did not address it. *Arizona v. Hicks*, 107 S.Ct. at 1154.

This court finds that the good faith exception established in *United States v. Leon* does not apply here. *Leon* did not address the admissability of evidence seized under a warrant that was based on information obtained in a prior illegal search. Further, it would be inappropriate and inconsistent with the reasoning of *Leon* to extend the good faith exception to such a situation.

In *United States v. Leon*, a police investigation was begun based on information received from an informant of unproven reliability. This investigation led to police observation of several individuals. Based on the observations made of individuals and residences, Officer Rombach, an "experienced and well-trained narcotics investigator" applied for a search warrant. A state court judge issued the warrant. The subsequent searches pursuant to that warrant turned up drugs at two residences and additional evidence of criminality in two of the respondents' automobiles. *Leon*, 468 U.S. at 901–902, 104 S.Ct. at 3409.

Respondents were indicted in District Court for conspiracy to possess and distribute cocaine and a variety of substantive counts. After an evidentiary hearing, the District Court acknowledged that Officer Rombach had acted in good faith. However, the District Court also determined

that the affidavit in support of the search warrant was insufficient to establish probable cause. As a result, some of the evidence seized under the warrant was suppressed. *Leon*, 468 U.S. at 902–904, 104 S.Ct. at 3409–10. The Ninth Circuit Court of Appeals agreed that the search warrant had not been supported by probable cause. The court rejected the government's argument that the evidence should nonetheless be admitted because the officer had conducted the searches in good faith reliance upon a search warrant. *Leon*, 468 U.S. at 905, 104 S.Ct. at 3411.

The United States Supreme Court granted certiorari and addressed the question of "whether the Fourth Amendment exclusionary rule should be modified so as not to bar the use in the prosecution's case in chief of evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." *Leon*, 468 U.S. at 900, 104 S.Ct. at 3409. The Supreme Court answered that question in the affirmative and created the "good faith exception" to the exclusionary rule.

In so ruling, the Court observed that the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." *Id.* at 906, 104 S.Ct. at 3412 (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974)). Further, "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916, 104 S.Ct. at 3417. The court concluded that "suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." *Id.* at 918, 104 S.Ct. at 3418 (footnote omitted).

In short, where the officer's conduct is objectively reasonable,

"excluding evidence will not further the ends of the exclusionary rule in any

appreciable way; for it is painfully apparent that ... the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." *Stone v. Powell*, 428 U.S. [465] at 539–540 [96 S.Ct. 3037 at 3073, 49 L.Ed.2d 1067] (White, J., dissenting).

This is particularly true, we believe, when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope. In most such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.... Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations. *Id.* at 919–921, 104 S.Ct. at 3419.

These quotes from *Leon* serve to clarify the issue which the Supreme Court addressed and the ends which the Court hoped to achieve through its ruling. *Leon* addressed situations in which a search warrant, subsequent to its execution, is found to have been lacking in probable cause due to an improper assessment by the issuing magistrate. *Id.* at 900, 104 S.Ct. at 3409. Therefore, *Leon* did not address the situation presented here, where the information upon which the search warrant was based was itself the product of an illegal, warrantless search by a police officer. Nor is there any indication that the *Leon* court intended that the good faith exception would extend to this situation. The Supreme Court recognized that the purpose of the exclusionary rule is to deter future police misconduct. *Id.* at 906, 104 S.Ct. at 3411. The good faith exception therefore operates in certain situations where the

exclusion of evidence would not serve to deter police misconduct. *Id.* at 922, 104 S.Ct. at 3420. As the Supreme Court observed, in most cases where a magistrate improperly determines that probable cause justifies the issuance of a warrant, "there is no police illegality and thus nothing to deter." *Id.* at 921, 104 S.Ct. at 3419.

In contrast, here we are presented with a detective who has conducted an illegal search and thereby secured the information upon which the magistrate's probable cause determination was based. Therefore, the goal of deterring future illegal searches by officers supports the application of the exclusionary rule in this case. The detective's explanation for reaching into the defendant's closet, retrieving a page of slides, and holding them up to the light for viewing was that he was merely marking time and in effect "browsing" while waiting to speak on the telephone.

■ This court considers the deterrence of such behavior by police officers to be a goal eminently worthy of the enforcement of the exclusionary rule. The detective was not a social guest of the defendant who happened to roam a bit and blunder upon evidence of criminality. He was present in the defendant's apartment for the purpose of executing an arrest warrant. An arrest warrant is not a general warrant to search the arrestee's home. In the performance of that official duty, the right of a police officer to search the surrounding premises is bounded by specific limits imposed by the Fourth Amendment. See *Chimel v. California*, 395 U.S. 752, 765–768, 89 S.Ct. 2034, 2041–42, 23 L.Ed.2d 685 (1969). It is clear that the detective could not have searched the closet pursuant to the arrest of the defendant. *See Supra.* Nor had his ongoing investigation of the defendant provided the detective with probable cause to believe that the closet contained evidence of criminality. This court recognizes · an unacceptable threat to the Fourth Amendment protection of future defendants if officers can "absent-mindedly" search within the confines of a home and acquire evidence which could not have been legally obtained through a conscious investigative effort. Further, the need to subjectively determine whether an officer was browsing or searching would place courts in a new "thicket" of Fourth Amendment law which promises to be impenetrable and is better left unexplored. *Cf. Hicks*, 107 S.Ct. at 1154.

■ Officers who enter a suspect's residence in order to make an arrest must be conscious of the official duty which brings them there and the constitutional limits surrounding the execution of that duty. The cavalier behavior of "leafing through" a suspect's possessions must be deterred. A court should not encourage such "carelessness" by permitting the introduction of the resulting evidence.

This court agrees with the observation of the Arizona Court of Appeals in *Arizona v. Hicks:*

> [W]hile *Leon* does hold that officers may reasonably rely on a magistrate's assessment of probable cause in issuing a warrant and that exclusion need not be ordered if the magistrate is wrong in that assessment, it does not hold that a subsequent warrant validates an earlier illegal search. Police officers cannot launder their prior unconstitutional behavior by presenting the fruits of it to a magistrate.

707 P.2d at 333.

The Ninth Circuit has recently examined this question and has reached the same result. In *United States v. Vasey*, 834 F.2d 782, 789 (9th Cir.1987), the court rejected the government's attempt to use *Leon* to save evidence seized under a warrant which was based on illegally seized evidence. In dismissing the government's argument as being "without merit," that court, like this one, found that an illegal search constitutes police misconduct which merits application of the exclusionary rule. *Id.* Further, in reviewing an application for a search warrant, a magistrate's effort is concentrated on a probable cause determination. The magistrate is not in a position to evaluate whether the evidence before him was seized in an illegal search. Therefore, the magistrate's review of that

evidence "does not sanitize the taint of the illegal warrantless search." *Id.*

For the foregoing reasons, the good faith exception of *Leon* is not applicable to the case at hand. All evidence seized in the search of the defendant's apartment is suppressed.