[No. E004695. Fourth Dist., Div. Two. Nov. 1, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
STEPHEN EDWARD LEICHTY, Defendant and Appellant.

COUNSEL

Dennis S. Tilton and Richard Price for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Michael D. Wellington, Esteban Hernandez and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SCHULTE, J.*—Defendant pled nolo contendere to one count of possession of methamphetamine for sale (Health & Saf. Code, § 11378). He was granted three years' probation on the condition that he serve 120 days in county jail. He appeals from the denial of his motion to suppress evidence pursuant to section 1538.5 of the Penal Code, on the ground that the evidence was the fruit of an illegal warrantless search.

FACTS

Michael Brooks, air cargo supervisor of an air freight facility at Ontario airport, was on duty on an evening in early September 1986. He noticed a five-gallon plastic container which had been received in shipment. The container was empty but smelled of ether; it had not been declared a hazardous material at the time of shipping, as is required in shipping such items. The package was addressed to defendant, but was picked up by a man who identified himself as Ramsey. Because of his concern that a hazardous material had been shipped improperly, Brooks contacted defendant by phone and explained to him the danger involved in shipping ether and the procedures for doing so. Defendant indicated he would not violate the procedures in the future.

Some 20 days later Brooks was again on duty at the air freight facility when defendant brought in a package for shipment. Defendant appeared very nervous and wore dark glasses. He stated that the package contained personal effects and Brooks accepted it for shipment. Brooks did not know defendant by sight; however, after defendant left the facility, Brooks recognized his name on the shipment as the name to which the empty ether bottle had been addressed. He became concerned that the shipment might contain

_____
*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.

hazardous materials and, along with an employee of the shipping airline, opened the package.

When the two men opened the package, they found two Pepsi bottles containing a yellowish liquid. The bottles had been packed in paper and potato chips. They had handwritten labels which stated that they contained "high grade two cycle model airplane oil." Brooks did not know whether airplane oil was a petroleum distillate and thus a hazardous material which must be declared prior to shipment. He also suspected that the package contained narcotics because of the method of packaging and the previous shipment of the ether bottle. He contacted the airport narcotics task force for assistance in identifying the contents of the bottles.

Two officers from the narcotics task force came to the air freight facility at 5:30 p.m. in response to Brooks' call—police detective Moriarity and sheriff's deputy Bracamonte. Brooks showed Moriarity the two Pepsi bottles in the open package. He also told Moriarity about the previous ether bottle shipment. Moriarity made a visual inspection of the bottles, which had screw-on caps and were sealed with cellophane tape. After looking at the bottles, Moriarity felt he had probable cause to believe that they contained contraband, specifically PCP. Bracamonte thought the liquid could be either PCP or liquid methamphetamine. After receiving permission to open the bottles from the airline employee, Moriarity opened one of the bottles and immediately smelled a strong, ether-like odor. Bracamonte also smelled ether. Moriarity then took the bottles to the task force office and contacted a criminalist to come to the office to investigate the bottles. Criminalist Sanchez of the Los Angeles Police Department reported to the task force office at 7:30 the same evening to perform field tests on the contents of the bottles. He performed two tests on the contents of the bottles; one was for "PCP and/or some other similar drugs," and the other for amphetamines. He testified: "The results of those tests weren't very conclusive. The results indicated some sort of drug present, but they were not the results I expected for PCP or methamphetamine . . . ."

Detective Moriarity then took the two bottles to the Los Angeles Police Department property division at Parker Center in downtown Los Angeles, where he booked them into evidence. On the following day criminalist Sanchez conducted laboratory tests on the contents of the bottles and concluded that they contained methamphetamine oil. Sanchez testified that normally he would not have conducted the laboratory tests because he was assigned to another unit. However, he testified that he performed the tests himself for the following reason: ". . . I was curious as to the nature of the substance, to relate back to the test that I performed on it and why they

appeared the way they did." No search warrant was obtained before the laboratory tests were carried out.

Police detective Greenwell had been in the airport narcotic task force office when Detective Moriarity brought the bottles there for field testing. Based on the results of the investigation of the suspicious package and the results of the laboratory tests at Parker Center, he obtained a warrant to search defendant's dormitory room at a local college. The search of the dorm room and a storage unit rented by defendant revealed numerous pieces of chemical apparatus normally used in the manufacture of methamphetamine, all of the chemical ingredients necessary for making amphetamine, and substances which tested positive in field tests for amphetamines.

A drug enforcement administration (DEA) officer arrested defendant pursuant to a warrant outside his dormitory. He was taken back to his room where a search was commenced. In a room next to defendant's dorm room, Greenwell gave defendant his *Miranda* warnings and questioned him concerning the incident. Defendant confessed to possessing and manufacturing methamphetamine.

Additional facts will be set out where pertinent to the discussion below.

## ISSUES ON APPEAL

Defendant contends that the law enforcement officers' exercise of dominion and control over the Pepsi bottles after visual examination constituted an illegal seizure without probable cause to believe that the bottles contained contraband; and that the opening and field testing of the contents of the bottles, as well as the laboratory testing, exceeded the scope of the private search and thus were illegal warrantless searches; so that the trial court erred in failing to suppress the evidence of the nature of the bottles' contents. He also contends that the evidence obtained as the result of the illegal seizure and searches, including all the physical evidence found in his dorm room and storage unit and his incriminating statements made at the time of the search, should be suppressed as the fruit of the poisonous tree. As we explain below, we agree that the trial court erred in failing to grant defendant's suppression motion.

## DISCUSSION

## I

## PROBABLE CAUSE TO SEIZE CONTRABAND

Defendant concedes that the initial opening and viewing of the contents of defendant's package was a private search by air cargo and airline employ-

ees and thus not subject to the exclusionary rule; and that Detective Moriarity and Deputy Bracamonte violated no rule of law in visually examining the contents of the opened package, which were in plain view. (*United States* v. *Jacobsen* (1984) 466 U.S. 109, 114-118 [80 L.Ed.2d 85, 94-97, 104 S.Ct. 1652]; *Walter* v. *United States* (1980) 447 U.S. 649, 657 [65 L.Ed.2d 410, 417, 100 S.Ct. 2395].) However, he argues that these officials did not have probable cause to believe that the bottles contained contraband after the visual inspection, and thus acted unlawfully in seizing the bottles without a warrant.

■ "[I]t is well settled that it is constitutionally reasonable for law enforcement officials to seize 'effects' that cannot support a justifiable expectation of privacy without a warrant, based on probable cause to believe they contain contraband." (*United States* v. *Jacobsen, supra,* 466 U.S. 109, 121-122 [80 L.Ed.2d at p. 99]; see *United States* v. *Place* (1983) 462 U.S. 696, 701-702 [77 L.Ed.2d 110, 116-117, 103 S.Ct. 2637].) " '[P]robable cause is a flexible, common sense standard.' *Texas* v. *Brown,* 460 U.S. 730, 742 [citations] (1983). It requires only that facts be available to the officers which would 'warrant a [person] of reasonable caution,' *Carroll* v. *United States,* 267 U.S. 132, 162 [citations] (1925), to believe that certain items may be contraband or evidence of a crime. *Brown,* 460 U.S. at 742 [citation]. 'A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.' *Id. (quoting Brinegar* v. *United States,* 338 U.S. 160, 176 [citations] (1949))." (*United States* v. *Licata* (9th Cir. 1985) 761 F.2d 537, 542.)

■ In the instant case, Detective Moriarity testified that before opening the bottles he felt he had probable cause to believe the bottles contained contraband, based on the following factors: (1) the suspicious circumstances surrounding the two shipments; (2) his own experience; (3) his observations of a silver residue in the two bottles, which he believed to be magnesium turnings used in manufacturing PCP; (4) the color of the liquid, which was consistent with liquid PCP; (5) the fact that defendant had indicated to the air cargo supervisor that the package contained personal effects, rather than model airplane oil; (6) his belief that model airplane oil must be commercially available so that there would be no need to repackage it in Pepsi bottles; and (7) the fact that the bottles were packaged in potato chips (he knew from experience that contraband was sometimes packaged in food products to mislead narcotic-sniffing dogs).

Deputy Bracamonte testified that after viewing and smelling the bottles he thought they contained either PCP or methamphetamine oil. He stated that he had seen methamphetamine oil before and that it had the same "Wesson oil-looking quality" as the liquid in the bottles. He, like Moriarity,

saw metal residue in the bottles, and he testified that he had seen such residue before in both PCP and methamphetamine oil.

Based on the law enforcement officers' testimony, we hold that they had probable cause to believe that the bottles contained contraband before opening and field testing them. The facts which they possessed concerning the bottles would have led any person of reasonable caution to believe that the bottles contained contraband drugs; failure to seize the bottles in such circumstances would have been a dereliction of duty, given the fact that the bottles were in a busy air terminus and were scheduled to be shipped out of the officers' jurisdiction.

## II

### WARRANTLESS FIELD TESTING

■ Defendant contends that, even if the officers did have probable cause to seize the bottles without a warrant, they violated his Fourth Amendment rights by conducting field tests to ascertain the contents of the bottles without first obtaining a search warrant. He argues that because this "search" exceeded the scope of the private search which had been conducted by the air cargo and airlines employees a warrant was required, citing *Walter* v. *United States, supra,* 447 U.S. at page 657 [65 L.Ed.2d at page 418].

In *Walter* an interstate shipment of obscene films was mistakenly delivered to a business office. (447 U.S. at p. 651 [65 L.Ed.2d at p. 414].) The office personnel opened the shipment and examined the individual film boxes on which were suggestive drawings and explicit descriptions of the contents of the films. (*Id.,* at pp. 651-652 [65 L.Ed.2d at pp. 414-415].) The office employees did not view the films. (*Id.,* at p. 652 [65 L.Ed.2d at pp. 414-415].) They contacted Federal Bureau of Investigation (FBI) agents who seized the films and viewed them with a projector without obtaining a warrant. (*Ibid.*) The government argued that it did not expand the private search by viewing the films because the private search had already destroyed the defendant's reasonable expectation of privacy in the shipment. (*Id.,* at p. 658 [65 L.Ed.2d at pp. 418-419].) A plurality of the court concluded that only part of the defendant's legitimate expectation of privacy had been frustrated by the private search, because the office employees had not viewed the actual contents of the films. (*Id.,* at p. 659 [65 L.Ed.2d at p. 419].) It explained that the FBI agents would have had the right to exceed the scope of the private search only if they had a right to make an independent search, and held that the agent's independent search was unlawful because it was conducted in the absence of any exigency. (*Id.,* at p. 657 [65 L.Ed.2d at p. 418].)

In *United States* v. *Jacobsen, supra,* 466 U.S. 109, decided four years after *Walter,* the Supreme Court was confronted with a case very factually similar to the case at bench. Employees of a private air freight carrier examined a package which had been damaged by a forklift. (*Id.,* at p. 111 [80 L.Ed.2d at p. 92].) Inside the package they found about six ounces of white powder in a Ziploc bag concealed inside a tube constructed of duct tape. (*Ibid.*) The employees summoned a DEA agent who removed a trace of the white powder and conducted a test which revealed the powder to be cocaine. (*Id.,* at p. 112 [80 L.Ed.2d at p. 93].) The field test used would disclose whether or not a substance was cocaine, but there was no evidence it would identify any other substances. (*Id.,* at p. 112, fn. 1 [80 L.Ed.2d at p. 93].)

A majority court in *Jacobsen* applied the *Walter* test, examining DEA agents' actions to see how far they exceeded the scope of the private search. (466 U.S. at p. 115 [80 L.Ed.2d at p. 95].) It concluded the agents exceeded the scope of the private search by field testing for cocaine; however, it then went on to determine whether the additional intrusion by the field test actually amounted to a "search" within the meaning of the Fourth Amendment, posing and answering the question of whether the test "infringe[d] an expectation of privacy that society is prepared to consider reasonable." (*Id.,* at p. 122 [80 L.Ed.2d at p. 100].) First, it emphasized that the test could tell the agents nothing more than whether or not the substance was cocaine— "not even whether the substance was sugar or talcum powder." (*Ibid.*) It then concluded: "A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative—merely disclosing that the substance is something other than cocaine—such a result reveals nothing of special interest. Congress has decided—and there is no question about its power to do so—to treat the interest in 'privately' possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest." (*Id.,* at p. 123 [80 L.Ed.2d at pp. 100-101].) The court held that "the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the [field] testing as a search subject to the Fourth Amendment." (*Id.,* at p. 124 [80 L.Ed.2d at p. 101].)

The field test of the bottles in this case likewise cannot be characterized as a search subject to the Fourth Amendment. The criminalist tested only for the presence of PCP and methamphetamine oil, neither of which is subject

to a legitimate interest in privacy. The field tests used were designed to reveal only whether methamphetamine, PCP, or similar drugs were present. Thus, law enforcement officers did not violate defendant's Fourth Amendment rights by field testing the bottles.

### III

### WARRANTLESS LABORATORY TESTING

■ While the field tests did not constitute an illegal warrantless search, the tests conducted at the police laboratory without benefit of a warrant are another matter. ■ Because warrantless searches are presumptively unreasonable, the prosecution must bear the burden of legally justifying warrantless activity such as that carried out by law enforcement officers in this case. (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 454-455 [29 L.Ed.2d 564, 576, 91 S.Ct. 2022].) ■ The field tests were inconclusive as to whether the bottles contained either PCP or methamphetamine oil. The criminalist testified that they revealed only that "some drug" was present; he did not state that the tests showed that the unknown drug was contraband. The criminalist also testified that he personally tested the contents of the bottles in the police lab because he was curious "as to the nature of substance," given the unexpected results of the field tests. He did not state whether the tests he conducted were designed only to show whether or not the bottles contained PCP, methamphetamine oil, or similar contraband drugs, or would have revealed the identity of the contents even if it were a substance in which defendant had a legitimate privacy interest. Thus, we conclude that the prosecution failed to carry its burden under *Jacobsen* to show that this significant expansion of the scope of the private search did not constitute a search within the meaning of the Fourth Amendment.

In reaching the above conclusion we are aided by the analysis in *United States* v. *Mulder* (9th Cir. 1987) 808 F.2d 1346. In *Mulder,* hotel employees searched a guest's suitcase and found 10 clear plastic bags containing tablets inscribed with the lettering "LEMMON 7/14." (*Id.,* at p. 1347.) They contacted DEA agents who seized the bags and, without obtaining a warrant, took them to a laboratory where they were tested "through the use of mass spectrometry, infrared spectroscopy and gas chromatography." (*Id.,* at p. 1348.) The tests showed that the tablets were methaqualone. (*Ibid.*) The government argued that the warrantless testing was not unlawful because it did not exceed the scope of the private search. (*Ibid.*) The court concluded that the lab testing exceeded the scope of the private search, and refused to extend the *Jacobsen* field test exception to the warrant requirement to the case before it. (*Id.,* at pp. 1348-1349.) It reasoned: "First of all, this case does not involve a field test, but a series of tests conducted in a toxicology

laboratory several days after the tablets were seized. Secondly, the chemical testing in this case was not a field test which could merely disclose whether or not the substance was a particular substance, but was a series of tests designed to reveal the molecular structure of a substance and indicate precisely what it is. Because of the greater sophistication of these tests, they could have revealed an arguably private fact." (*Ibid.*)

As in *Mulder,* the facts of this case do not warrant the extension of the *Jacobsen* field test case to laboratory testing. They involved testing in a police laboratory the day after the seizure and there is no evidence that the lab tests were limited only to those which would reveal the presence of contraband drugs. ██ ██ ██ ██ ██ Moreover, because no exigency existed once the law enforcement officers had secured the bottles and removed them to police headquarters, a warrantless search could not be justified on any other basis. (*Walter* v. *United States, supra,* 447 U.S. at p. 657 [65 L.Ed.2d at p. 418].)[1]

## IV

### SUPPRESSION OF THE EVIDENCE AS THE "FRUIT OF THE POISONOUS TREE"[2]

██ Defendant contends the evidence discovered in the search of his dorm room and storage room pursuant to a search warrant, as well as the incriminating statements he made to law enforcement officers at the time of the search, must be suppressed because they were elicited based on "tainted" evidence obtained in the warrantless laboratory tests. The People do not deny that the search warrant was based on tainted evidence; however, they argue that the evidence was properly admitted under the "good faith exception" to the exclusionary rule established in *United States* v. *Leon* (1984) 468 U.S. 897 [82 L.Ed.2d 677, 104 S.Ct. 3405].

---

[1] The People contend that the search was legal because the air cargo and airline personnel gave their consent to the search, or that defendant impliedly consented to the search because once he entered the "package shipment area, he was confronted with signs warning him that all packages were subject to inspection for explosives, etc." These contentions are without merit. The People's argument, unsupported by any authority, that third party consent by airport personnel rendered the warrantless laboratory tests legal is specious, especially because at the time the laboratory tests were run it had been determined that the bottles contained "some sort of drugs" rather than explosives. Moreover, the People failed to carry their burden to show that warning signs about inspections were posted in the air freight facility when defendant took the package there for shipment. A witness was asked whether there were such signs posted in the facility on the day defendant brought in the package containing the bottles. He stated that there should have been a sign on the counter of the facility, but could not recollect whether a sign was in fact posted there on that day. (See *United States* v. *Davis* (9th Cir. 1973) 482 F.2d 893, 914-915.)

[2] *Wong Sun* v. *United States* (1963) 371 U.S. 471, 488 [9 L.Ed.2d 441, 488, 83 S.Ct. 407].

In *Wong Sun* v. *United States, supra,* 371 U.S. at page 488 [9 L.Ed.2d at page 455] the United States Supreme Court held that evidence which "has been come at by exploitation of [a primary] illegality" rather than "by means sufficiently distinguishable to be purged of the primary taint," must be suppressed pursuant to the exclusionary rule. In the case at bench, there has been no assertion by either party that the physical evidence and admissions in question were gotten at by means separate from the illegal warrantless laboratory tests. Thus, the search warrant was obtained and the evidence gathered by exploitation of a primary illegality. Under *Wong Sun,* the trial court erred in failing to suppress this evidence pursuant to the exclusionary rule.

*United States* v. *Leon, supra,* 468 U.S. at page 922 [82 L.Ed.2d at page 698], recognized a good faith exception to the exclusionary rule. In *Leon,* police conducted a search pursuant to a warrant which later proved to be lacking in probable cause but which was not legally deficient on its face. (*Id.,* at p. 926 [82 L.Ed.2d at p. 700].) The Supreme Court held that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." (*Id.,* at p. 922 [82 L.Ed.2d at p. 698].) In reaching its decision, the court pointed out that the purpose of the exclusionary rule is "to deter police misconduct rather than to punish the errors of judges and magistrates." (*Id.,* at p. 916 [82 L.Ed.2d at p. 694].) It stated that "[i]f exclusion of evidence obtained pursuant to a subsequently invalidated warrant is to have any deterrent effect, . . . it must alter the behavior of individual law enforcement officers or the policies of their departments." (*Id.,* at p. 918 [82 L.Ed.2d at p. 695].) The court concluded that "suppression of evidence . . . should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." (*Ibid.*) The court ruled that the exclusionary doctrine did not apply to the case before it, because it was a close legal question as to whether there was in fact probable cause to support the warrant, and the defect in the warrant could not have been apparent to the police officers who sought and executed it. (*Id.,* at p. 926 [82 L.Ed.2d at pp. 700-701].)

Approaching this matter on a case-by-case basis, as required by *Leon,* we must conclude that it is one of those "cases in which exclusion will further the purposes of the exclusionary rule." (468 U.S. at p. 918 [82 L.Ed.2d at p. 695].) Here, unlike in *Leon,* the law enforcement officers obtained the search warrant through exploitation of their primary illegal behavior in conducting laboratory tests on the contents of the Pepsi bottles. Thus, imposition of the exclusionary rule will work to deter this illegal behavior, rather than to punish a judicial or magisterial error. Though we reach this

conclusion reluctantly given the very serious nature of defendant's admitted transgressions, we feel that we are compelled to do so by existing law.

We are aided in reaching the above conclusion by *U.S.* v. *Vasey* (9th Cir. 1987) 834 F.2d 782, in which the circuit court was also confronted with a case in which tainted evidence obtained through an illegal warrantless search was included in the affidavit to support issuance of a search warrant. (*Id.,* at pp. 788-789.) In *Vasey,* as here, the court concluded that the *Leon* analysis did not apply because the officers who obtained and served the warrant were acting in bad faith when they gathered and used the tainted evidence. (*Id.,* at p. 789; accord: *U.S.* v. *Villard* (D.N.J. 1988) 678 F.Supp. 483, 490-493.) The *Vasey* court also held that the action of the magistrate in considering the evidence offered to support the search warrant did not "sanitize the taint of the illegal warrantless search," because a magistrate, working under time constraints and without benefit of an adversarial hearing, "is simply not in a position to evaluate the legality" of [the warrantless] search. (*U. S.* v. *Vasey, supra,* 834 F.2d at p. 789; accord: *U. S.* v. *Villard, supra,* 678 F.Supp. at p. 493.)[3]

Based on the above analysis, we hold that the evidence obtained pursuant to the search warrant, including both the physical evidence and defendant's incriminating statements made at the time of the search, is subject to the exclusionary rule. The trial court erred in failing to exclude this evidence pursuant to defendant's motion to suppress.

### DISPOSITION

Judgment reversed.

Campbell, P. J., and Hews, J., concurred.

Respondent's petition for review by the Supreme Court was denied February 15, 1989.

---

[3] The People also cite *Rodriguez* v. *Superior Court* (1988) 199 Cal.App.3d 1453 [245 Cal.Rptr. 617] to support their argument that the *Leon* good faith exception applies to this case. *Rodriguez* is inapposite, however, since it does not involve the use of tainted evidence to support the search warrant in question.