[No. B042794. Second Dist., Div. Two. June 27, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
HERBERT DWAYNE COSTON et al., Defendants and Appellants.

**COUNSEL**

Tim Brosnan, under appointment by the Court of Appeal, Glass & Kramer, William Everett Glass and Julie Schumer for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Linda C. Johnson and Sharon R. Wooden, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

GATES, J.—Herbert Dwayne Coston and Victor Trapps were apprehended as they each attempted to smuggle two kilos of cocaine aboard an airplane. Consequently, they entered pleas of guilty to transporting this contraband (Health & Saf. Code, § 11352) and admitted that its volume was at least 28.5 grams (Pen. Code, § 1203.073, subd. (b)(1)), and, in fact, was in excess of 3 pounds. (Health & Saf. Code, § 11370.4, subd. (a).) Nonetheless, and despite these admissions, the court found their cases to be sufficiently unusual, apparently due to their lack of previous criminal records, that it granted them probation. They appeal.

Their guilt never having been open to question, appellants expended great time and effort below challenging the manner in which their criminal activities were detected and foiled. They renew those campaigns here.

The defense presented no evidence and the determinative facts were not in dispute. On January 7, 1988, appellants exited a cab at Burbank Airport and removed a blue bag. Michael Lemons, a security employee testified that "[u]sually when you see two Black males dressed the way they were dressed. Usually they are movie stars. Athletes. And they kind of caught my eye." Both of them were wearing "[w]rap-around glasses . . . something similar to what Eric Dick[er]son wears."

After appellants entered the airport they "sat down outside the screening area by the ticket agents. Sat there and looked . . . toward the screening area . . . for ten to fifteen minutes." They then proceeded to the walk-through device which detects metal objects that Lemons was staffing.

Unfortunately for appellant Coston, whoever had prepared his kilo packets of cocaine for transport had wrapped one of them in aluminum foil as well as in traditional brown contact shelf paper. Consequently, the machine's alarm was activated as he passed through its portals. Twice more his attempted transits proved unsuccessful, even after he had removed all metal objects from his pockets, including, at the suggestion of his companion, appellant Trapps, a solitary key.

Finally, Lemons asked Coston to step to one side and unzip his coat jacket. However, when Lemons, utilizing a hand wand, sought to determine

what was setting off the alarm, Coston stepped backward. As a result, Lemons was only able to effect a glancing touch of Coston's underarm. Nonetheless, as he did so the wand emitted a "real loud" sound and Lemons could feel "something real heavy" which he believed might be the butt end of a gun. Therefore, he turned to his supervisor, a Mrs. Cortorno, and asked her to "Push the [code] red button. I think he has a gun." She complied.

Coston immediately began reloading the items he had removed from his pockets. When Trapps inquired as to the bag they already had passed through the luggage inspection chute, Coston replied, "Forget the bag. Let's get out of here." Both men then hastened to and through the exit doors. As they rapidly walked away, Mrs. Cortorno followed and alerted the approaching police officers to their presence, advising it was Coston, who was wearing a white checked jacket, who was believed to have a gun.

Burbank Airport Police Officer Gary Bransfield had received the code red message which signaled the existence of an imminent danger to the public. When he saw Mrs. Cortorno point and heard her warning, he used his hand held radio to instruct another officer who was even closer to the two hurrying appellants, "The man with the white jacket has a gun. Stop him." This officer drew his own weapon, directed Coston to kneel and handcuffed him.

Though all other arriving and departing passengers in the vicinity stopped to observe this startling scene, appellant Trapps simply ignored his companion's plight and continued walking straight ahead, never looking back. He, too, was soon apprehended.

Bulges were visible under Coston's arms and when Officer Bransfield patted him down he could feel hard objects which he believed might be weapons. When he lifted Coston's sweatshirt in order to identify them, he saw the two-kilo bricks taped to Coston's body.

As for Trapps, similar hard, bulky objects could be both seen and felt beneath his arms. They, too, were recovered and proved to be typical brown packaged kilos of cocaine also secured by tape.

Detective James Phillip Bonar, an experienced narcotics officer for the City of Burbank, was called to the scene and given the packages. He concluded from their size, shape, and feel, as well as from appellants' behavior, that they contained cocaine being transported for sale. He formally arrested both appellants and opened a portion of the one package that still continued to activate the alarm. In so doing he observed the foil and a white crystalline powder which he believed to be cocaine. At the station he performed a

test on the substance to confirm his opinion and then turned all of the packets over to a laboratory for further analysis.

When the People moved to admit the cocaine into evidence, counsel for appellants objected. Since Trapps's attorney previously had said he would not be making a Penal Code section 1538.5 motion to suppress, the magistrate permitted the People to present additional evidence regarding his client's arrest.

## I

Each of appellants' several contentions is meritless. ■ The suggestion that once having abandoned their luggage and their attempt to take flight aloft, their attempted flight afoot should not have been aborted, is frivolous. All their actions occurred inside or immediately adjacent to a relatively small, but crowded, airport; for the police to have done less would have been grossly unprofessional. (*Morad* v. *Superior Court* (1975) 44 Cal.App.3d 436, 442 [118 Cal.Rptr. 519].)

## II

■ Similarly, if, in the course of enforcing a lawful detention, the steps taken by our peace officers to guard their own safety, and that of the public at large, are reasonable, their exercise does not elevate the amount of "probable cause" required to justify the detention itself. (See *People* v. *Taylor* (1986) 178 Cal.App.3d 217, 230 [223 Cal.Rptr. 638]; *People* v. *Campbell* (1981) 118 Cal.App.3d 588, 595 [173 Cal.Rptr. 442].) That is to say, society cannot in good conscience require those it employs to enforce its laws to choose between (1) placing their own lives in peril or (2) ignoring their sworn duty to investigate apparent criminal activity.

Since here there was objective cause to believe Coston was armed and dangerous, the somewhat lengthy observation we made over two decades ago, long before the recent most grievous escalation of fatal violence associated with the increased traffic in deadly drugs, apparently warrants repetition here: "As aptly expressed in the majority opinion in *Terry* v. *Ohio* [(1968) 392 U.S. 1, 23-24,] 20 L.Ed.2d 889, 907 [88 S.Ct. 1868]: 'We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this

country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.[21]'

"In footnote 21 of its opinion, the court noted that: 'Fifty-seven law enforcement officers were killed in the line of duty in this county in 1966, bringing the total to 335 for the seven-year period beginning with 1960. Also in 1966, there were 23,851 assaults on police officers, 9,113 of which resulted in injuries to the policemen. Fifty-five of the 57 officers killed in 1966 died from gunshot wounds, 41 of them inflicted by handguns easily secreted about the person.'

"These facts undoubtedly were in the mind of Justice Harlan when, in his concurring opinion in *Terry*, he stated at page 913 [20 L.Ed.2d]: 'Where such a stop is reasonable, however, the right to frisk must be immediate and automatic if the reason for the stop is, as here, an articulate suspicion of a crime of violence. Just as a full search incident to a lawful arrest requires no additional justification, a limited frisk incident to a lawful stop must often be rapid and routine. There is no reason why an officer, rightfully but forcibly confronting a person suspected of a serious crime, *should have to ask one question and take the risk that the answer might be a bullet.*' [Italics in original.]" (*People* v. *Heard* (1968) 266 Cal.App.2d 747, 753-754 [72 Cal.Rptr. 374].)

Of even greater antiquity, but equal verity, were the apposite comments of the court in *People* v. *Koelzer* (1963) 222 Cal.App.2d 20, 27 [34 Cal.Rptr. 718]: "Our zeal to fend off encroachments upon the right of privacy must be tempered by remembrance that ours is a government of laws to preserve which we require law enforcement officers—live ones. Without becoming a police state, we may still protect the policeman's status."

## III

█ Equally meritless is the contention that it was improper for Detective Bonar, the narcotics officer, to immediately open one of the packages appellants had concealed on their bodies, and later to informally test its contents, in order to quickly verify, so far as possible without professional chemical analysis, its contraband nature. (*New York* v. *Belton* (1981) 453 U.S. 454, 460-461 [69 L.Ed.2d 768, 774-776, 101 S.Ct. 2860]; *People* v. *Chavers* (1983) 33 Cal.3d 462, 473 [189 Cal.Rptr. 169, 658 P.2d 96]; *People* v. *Sanchez* (1985) 174 Cal.App.3d 343, 348 [220 Cal.Rptr. 53]; *People* v. *Gutierrez* (1984) 163 Cal.App.3d 332, 334-335 [209 Cal.Rptr. 376].)

## IV

 Citing *People* v. *Leichty* (1988) 205 Cal.App.3d 914 [252 Cal.Rptr. 669], appellants next argue that even if the official action to this point was not unlawful, no further scientific examination of the apparently illicit powder they had sought to conceal should have been performed without the benefit of some type of warrant. In *Leichty*, it was held to be entirely proper for airport employees to seize and search a suspect package and even for a narcotics officer to perform a field test of its contents. However, the court then concluded that, in the absence of exigent circumstances, when the field tests had proven inconclusive, formal court authorization should have been sought and obtained before any further examinations were conducted at a police laboratory.

While adversely critiquing the decisions of our colleagues, state or federal, without the benefit of their appellate records is always inappropriate, we must confess we entertain the most serious reservations regarding the conclusions reached in *Leichty* and in *United States* v. *Mulder* (9th Cir. 1987) 808 F.2d 1346, 1348. Happily, however, we need not seek to resolve those doubts since, whatever may be said of the reasoning of *Mulder* (see *U.S.* v. *Snyder* (9th Cir. 1988) 852 F.2d 471, 473, fn. 1), its holding is not binding upon us, and the factual scenario we face is manifestly distinguishable from the rare and peculiar one apparently under consideration in *Leichty*.

As our trial court noted in this more typical instance, *Leichty*'s holding would be "preposterous" if it were taken to mean that whenever seemingly illegal drugs have been seized, "before the police agencies' lab can do a study, they have to run to a court to get a search warrant." No such requirement, of course, exists and we would not insult the authors of *Leichty* by presuming they intended to ignore the holdings of our highest courts by creating one.

"Since it is plainly within the realm of police investigation to subject objects properly seized to scientific testing and examination [citation], defendant cannot reasonably contend that such testing and examination was in derogation of his Fourth Amendment rights and that evidence obtained thereby was therefore inadmissible." (*People* v. *Teale* (1969) 70 Cal.2d 497, 508 [75 Cal.Rptr. 172, 450 P.2d 564]; *People* v. *Robinson* (1974) 41 Cal.App.3d 658, 667 [116 Cal.Rptr. 455].)

"A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under

circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative—merely disclosing that the substance is something other than cocaine—such a result reveals nothing of special interest. Congress has decided—and there is no question about its power to do so—to treat the interest in 'privately' possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest." (*United States* v. *Jacobsen* (1984) 466 U.S. 109, 123 [80 L.Ed.2d 85, 100-101, 104 S.Ct. 1652], fn. omitted.)

Even had we a surfeit, rather than a shortage, of peace officers and magistrates, such a requirement could only serve to trivialize our citizens' constitutional rights. Today the public suffers enough from the fact that there frequently is no one available to respond in timely fashion to reported burglaries, robberies and assaults in progress without demanding that our limited forces devote additional time to composing written or oral justifications whenever they wish to determine whether a spot on a suspect's clothing is blood, whether a paint scraping from a suspect's car matches that found at the site of a hit-and-run accident, whether urine samples contain an inordinate amount of alcohol, et cetera.

In sum, once the authorities are lawfully possessed of suspected contraband or other evidentiary materials, they are entitled to, and should, move as quickly as possible to validate, or dispel, the beliefs that justified their seizure in the first instance. (*People* v. *Teale*, *supra*, 70 Cal.2d at p. 508 et seq. and cases cited therein.) Certainly the affront to the dignity of their owners will not be further increased, nor their privacy rights diminished, by such action.

## V

■ Equally meritless is appellant Trapps's contention that the magistrate improperly allowed additional evidence to be presented at his preliminary examination when he objected to receiving in evidence the large quantity of cocaine he was transporting, even though initially he had stated he would not be making a Penal Code section 1538.5 motion. While it is true this objection might simply have been overruled, in light of the tactical maneuvering appellants already had succeeded in introducing into this proceeding, the magistrate's cautious ruling was eminently reasonable.

By their request for judicial notice, appellants have made known to us the fact that following an earlier preliminary hearing in which they had elected not to exercise their right to challenge the manner in which the proofs of

their guilt had been harvested, they nonetheless had subsequently been able to induce a superior court judge to grant their Penal Code section 995 motions because their stock of cocaine had been tested in a laboratory without benefit of some sort of "search," or "examination," warrant. Inasmuch as this jurist erred in even considering such motions (*People* v. *Williams* (1989) 213 Cal.App.3d 1186 [262 Cal.Rptr. 303]), as well as in making his evidentiary ruling (see our discussion, *ante*), the second magistrate wisely took steps to avoid, so far as possible, a reprise of those errors.

## VI

■ Finally, appellant Trapps urges the prosecution did not carry its burden under *People* v. *Harvey* (1958) 156 Cal.App.2d 516, 523 [319 P.2d 689], and *People* v. *Madden* (1970) 2 Cal.3d 1017, 1021 [88 Cal.Rptr. 171, 471 P.2d 971]. However, contrary to those cases, the witnesses who testified here had personally observed the conduct that justified each appellant's detention and arrest as well as the confiscation of his bountiful supply of cocaine.

The judgments are affirmed.

Compton, Acting P. J., and Fukuto, J., concurred.

Appellants' petition for review by the Supreme Court was denied October 10, 1990.